UNITED STATES of America,
Plaintiff,

v.

Mary Ellen Margaret MAZZEO a/k/a Melony Mazzeo, Long Island Savings Bank, New York State Department of Taxation & Finance, and Richard L. Stern, as Chapter 7 Trustee in the case of Salvatore J. Mazzeo, Case No. 896–87418 (Bankr.E.D.N.Y.) Defendants.

No. CIV.A. 98–3060–WGY.

United States District Court,
E.D. New York.

Feb. 23, 2004.

Bartholomew Cirenza, U.S. Department of Justice, Trial Attorney, Tax Division, Bonni J. Perlin, United States Department of Justice, Trial Attorney, Tax Division, Washington, DC, for United States of America, Plaintiff.

Joseph J. Haspel, Goshen, Joseph J. Haspel, Joseph J. Haspel, PLLC, for Mary Ellen Margaret Mazzeo, Defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

**In this case equity and common sense war against the needs of the IRS, in a largely voluntary tax system, ruthlessly to grind down tax cheats. So it is that the IRS, by manipulating penalty and interest payments, can use a decades old tax debt (the principal of which has been fully paid and then some) to evict an innocent widow and her son from the family home.**

This case concerns the conveyances by a husband, Salvatore J. Mazzeo ("Mazzeo"), to his wife, Mary Ellen Margaret Mazzeo ("Mrs. Mazzeo"), of a home, of money used for substantial construction on that home, and of other money, all while Mazzeo owed substantial tax liabilities to the United

---

1. Of the District of Massachusetts, sitting by designation.

States government ("United States"). The United States charges that the initial transfer of the home, the construction and improvements, and the other transfers were part of an intentional scheme to defraud the United States as a creditor, and should be set aside as fraudulent conveyances.

## I. BACKGROUND AND FACTS

### A. Causes of Action and the Relevant Statutes

On April 22, 1998, the United States, pursuant to 26 U.S.C. §§ 7401 and 7403, brought an action in this Court, seeking a declaration that Mazzeo's transfer of the home to Mrs. Mazzeo was null and void as against the United States, and to foreclose tax liens allegedly attaching to that property. Compl. [Doc. No. 1]. In Count I of the United States' Amended Complaint [Doc. No. 90], the United States seeks to set aside the December 11, 1985 conveyance of the home in East Williston from Mazzeo to Mrs. Mazzeo as constructively and actually fraudulent under New York State Debtor and Creditor Law §§ 273 and 276.[2] The United States contends that because this transfer rendered Mazzeo insolvent, or because he was insolvent when he made it, and because it was made with the actual intent to hinder, delay, or defraud the United States, his creditor, it

---

2. Section 273 reads:
Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
N.Y. Debt. & Cred. Law § 273.
Section 276 reads:
Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
*Id.* § 276.
A person is "insolvent" when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." *Id.* § 271(1).
The requirements to be deemed "Fair Consideration" are described as follows:
Fair Consideration is given for property, or obligation,
(a) When in exchange for such property, or obligation, as a fair equivalent thereof, and in good faith, property is conveyed or an antecedent debt is satisfied, or
(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
*Id.* § 272.

The term "conveyance" "includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance." *Id.* § 270.

A "creditor" is "a person having any claim, whether mature or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* § 270.

And finally, in discussing the rights of creditors whose claims have matured, the Debtor and Creditor Law of the State of New York states that:
1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
b. Disregard the conveyance and attach or levy execution upon the property conveyed.
2. A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.
*Id.* § 278.

should be set aside under Sections 273 and 276. The United States thus asks this Court to declare this transfer null and void as against the United States.

In Count II, the United States seeks to declare null and void as against the United States as a creditor of Mazzeo the transfers by Mazzeo, through nominee corporations that he controlled, to Mrs. Mazzeo of funds to improve the subject real property. The United States specifically seeks to set aside numerous distinct transactions with different subcontractors regarding all the construction work done at the home in East Williston from 1994 to 1997. The United States contends that all of these transactions were payments by Mazzeo that, while ostensibly done to improve the home, were actually an attempt to avoid paying these monies to his creditors, and can all be traced into the home. In addition, the United States seeks to void transactions in which Mazzeo paid for personalty that is currently located at the property (elephant tusks, an antique shield, etc.), again arguing that these transfers were constructively and actually fraudulent. The United States therefore seeks a judgment from this Court impressing a lien against the house for the total amount of these transactions.

Lastly, in Count III, the United States seeks to declare null and void under Sections 273 and 276 certain transfers of funds by Mazzeo, through nominee corporations that he controlled, to and for the personal benefit of Mrs. Mazzeo, including but not limited to: the transfers of funds to Long Island Savings Bank and its successor, the Astoria Federal Savings and Loan Association ("Astoria Savings and Loan"), for the payment of the mortgage loan obligations of Mrs. Mazzeo; the transfer of funds to various life insurance companies for the payment of life insurance premiums insuring Mazzeo's life; and transfers of funds directly to Mrs. Mazzeo.

In doing so, the United States seeks to set aside numerous distinct transactions and seeks a money judgment or equivalent for the total amount of these transactions.

The United States seeks to declare *all* the subject conveyances "null and void," and is proceeding under Section 278(1)(b)'s election of remedies to levy execution directly on the property.

### B. Factual and Procedural Background

On June 28, 1985, Mazzeo purchased a home valued at $335,000 at 41 Post Avenue, East Williston, New York, ("the home") with a down payment of $100,000, and he took a mortgage from the Dime Savings Bank. Pl.'s Ex. 2 & 5. Mazzeo was then working at Creative Securities, a brokerage firm owned by his father, Fred Mazzeo. Two months later, in August 1985, this brokerage firm imploded and Mazzeo was out of a job. Nevertheless, on September 22 of that year, he married Mrs. Mazzeo. In December 1985, Mazzeo transferred the home, by deed, to his wife. Pl.'s Ex. 3. At the time of this transfer, Mazzeo owed a considerable amount of federal income tax to the United States for the tax year 1984—approximately $57,000 in assessed taxes, not including accrued interest and late penalties. *See* Pl.'s Ex. 31 & 33.

Regarding the state of his business affairs at the time he conveyed the home to his wife, Mazzeo testified in a deposition taken during his later bankruptcy proceedings that: the value of Creative Securities capital went from $28 million to $0 in three days, Pl.'s Ex. 39, at 25; after Creative Securities went out of business, almost all of his personal stock, purchased on margin, was worthless and he was forced to write off his losses in these stocks, but remained liable for the margin calls, *id.* at 41; and from the end of 1985 he was

"blackballed" from the securities industry, and in the second half of 1985 he earned only $11,000 working for Shelter Rock Securities, *id.* at 26–27; Pl.'s Ex. 50–51. Mazzeo's personal income tax returns for the years 1985 and 1986 support these assertions, as he reported a "total income" of negative $6,993 in 1985 and negative $57,832 in 1986. Pl.'s Ex. 50–51.

As for his assets at the time of the transfer, Mazzeo's deposition testimony shows that he had partnership interests in four limited partnerships: 1) Immunomedics, 2) Higgins–Rosemont, 3) Thornhill, and 4) 100 Randall Associates, and the Court infers from that testimony that the value of these interests in December 1985 was approximately $320,000. *See* Pl.'s Ex. 39, at 44–48. Mazzeo testified further that in December 1985, he owned a fully furnished condominium in Florida, which he had purchased roughly three years before for $107,000, subject to a five-year $90,000 note. *See id.* at 18. The Court finds that $40,000 is a reasonable estimate for the equity that Mazzeo had in the condominium as of December 1985. The Court also credits Mazzeo's testimony that as of December 1985 he owned a new boat with a purchase price of $50,000. *See id.* at 17. The Court also finds that Mazzeo owned an Audi at that time, and was owed an indeterminate but substantial sum of money by Creative Securities. *See id.* at 14, 40, 64, 71.

Mrs. Mazzeo refinanced the original mortgage on the home on July 16, 1987, through Long Island Savings Bank, whose successor in interest by merger is Astoria Savings and Loan, and obtained new mortgage financing totaling $261,800. Pursuant to Judge Seybert's April 27, 2001 Stipulation and Order [Doc. No. 107] in this case, Astoria Savings and Loan still has a valid first mortgage lien on the home. Mrs. Mazzeo took a second mortgage on the home on February 12, 1988, in the amount of $58,000, from Capital Homeowner Services Corporation, who later assigned its interest to Marine Midland Bank. Pl.'s Ex. 6. This mortgage has been satisfied.

On October 5, 1987, Mazzeo filed his 1984 U.S. Individual Tax return with the Internal Revenue Service, reporting a total tax liability of $57,377, plus $3,725 in penalties for failure to pay. Pl.'s Ex. 33. Mazzeo paid $10,000 to the IRS on this date, leaving an unpaid balance due of $51,102, not including interest and penalties. Pl.'s Ex. 31. On November 9, 1987, a delegate of the Secretary of the Treasury made assessments against Mazzeo and demanded payment in the amount of $101,161.99 for the 1984 taxable year, comprising $57,377 in 1984 income tax, $3,607.34 in Estimated Tax Penalty (I.R.C. § 6654), $12,909.83 in Late Filing Penalties (I.R.C. § 6651(a)(1)), $8,843.43 in Failure to Pay Tax Penalties (I.R.C. § 6651(a)(2) & (3)), and $19,424.39 in interest (I.R.C. § 6601). *Id.* Payments of this debt have been made in the amount of $136,904.03, culminating in a payment of $50,000 on December 6, 2000, and the unpaid *assessed* balance of Mazzeo's 1984 tax liability is now $0. *Id.* The United States still claims that it is owed $134,551.57 in accrued interest on this debt as of June 30, 2002, *see* Pl.'s Prop. Findings of Fact [Doc. No. 156] ¶ 7, a claim that is of real significance in this case, as will be discussed below.

Beginning in June 1994, the house and garage on the property in East Williston were razed and rebuilt. From June 1994 to July 1997, various other improvements were made on the property as well. The primary general contractors who did most of this work were the firm Curto & Curto, pursuant to a contract between themselves and Mazzeo, made in April 1995, Pl.'s Ex. 8(A), though various subcontractors were

used. In addition to the construction work done on the property, Mazzeo, through the entities listed below, also made extensive purchases of personalty, most of which were then used as decorations at the home in East Williston.

Payments to these contractors and for the personalty were made principally by SLMP Holding Corporation ("SLMP"). Mazzeo was the president of SLMP at all relevant times and had check-signing authority. Mazzeo owned the shares of SLMP until 1995, when those shares were transferred to Unitek Consultants, Inc. ("Unitek"), which was wholly owned by Charles Leonhardt. Mazzeo has testified in a deposition conducted by the United States that he also "owned" 30% of the entity United Acquisitions III Corporation ("United"). Pl.'s Ex. 39, at 88–90. In addition to SLMP, Unitek and United made payments for the improvements and construction done at the property.

Mazzeo testified that the cost for this new construction totaled approximately $550,000, of which an estimated $300,000 was paid for by his "own earnings," and roughly an additional $250,000 was borrowed. *See id.* at 84–87, 92; Pl.'s Ex. 40, at 118. The United States contends that the total of the transfers used for the home improvements was $847,375.59, of which $555,049 was paid to Curto & Curto directly. Pl.'s Prop. Findings of Fact ¶ 14.

Mazzeo also made payments during the relevant period, through the corporate entities listed above, that benefitted Mrs. Mazzeo personally. These included payments for premiums on a life insurance policy insuring Mazzeo's life, mortgage payments on the property to Long Island Savings Bank, and cash transfers to Mrs. Mazzeo, allegedly totaling approximately $60,000. Pl.'s Ex. 24, 25, 27–29.

On December 21, 1995, one day before a notice of deficiency for unpaid New York state withholding taxes was due to ripen into an assessment against him, Mazzeo filed a voluntary petition in bankruptcy under Chapter 13; he did not include any tax liabilities on the bankruptcy schedule, and additional alleged unreported debts were later uncovered. *See In re Mazzeo,* 131 F.3d 295, 299 (2d Cir.1997).[3] This Chapter 13 case was dismissed for lack of jurisdiction, because Mazzeo exceeded the statutory unsecured debt limit. *In re Mazzeo,* 213 B.R. 625 (E.D.N.Y.1996), *aff'd* 131 F.3d 295 (2d Cir.1997).

Mazzeo was a stockholder and officer of Westfield Financial Corp. ("Westfield"), a corporation that failed to pay its withholding tax liability to the IRS and to the State of New York in 1994. *See Mazzeo,* 131 F.3d at 299; Pl.'s Ex. 32. On November 27, 1996, the United States assessed Mazzeo a 100% penalty in the amount of $999,305.08, later adjusted to $740,098.30, a "Responsible Person Assessment" pursuant to 26 U.S.C. § 6672, by reason of his willful failure to collect, truthfully account for, or pay over withheld income and Federal Insurance Contributions Act taxes due and owing from Westfield for the periods ending March 31, through December 31, 1994. *See* Pl.'s Ex. 31, 31(a), 32; *see also* Pl.'s Ex. 39, at 32 (reproducing deposition testimony by Mazzeo that Westfield went out of business at the end of 1994).

On the date of the November 9, 1987 assessment, a lien arose in favor of the United States and attached to all property and rights to property of Mazzeo under 26 U.S.C. § 6321. A similar thing occurred

3. The State of New York, rather than participating in this case actively to recover tax monies that Mazzeo owes to it, has stipulated with the United States as to how any recovery in this case shall be divided between the state and federal governments. Stipulation and Settlement of Federal/State Priorities [Doc. No. 48], *reproduced in* Pl.'s Ex. 79.

on the date of the November 27, 1996 assessment, although matters are complicated by the fact that Mazzeo had filed a Chapter 11 bankruptcy petition on November 15, 1996. Under 11 U.S.C. § 362(b)(9)(D),[4] although the IRS may assess taxes during the automatic stay's pendency:

> [A]ny tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor.

*Id.* The lien still attached to any property Mazzeo acquired after he filed his Chapter 11 case, as such property was not property of the estate. The estate's property was, by definition, not Mazzeo's.

A special Notice of Federal Tax Lien with respect to all of the tax liabilities described above was filed by the United States under the name of "Marry Ellen Mazzeo as the fraudulent grantee of Salvatore J. Mazzeo" with the Nassau County Clerk's Office on April 2, 1998, in order to ensure that a reasonable inspection of the tax lien index would reveal that the tax liens against Mazzeo attach to the subject property even though title had already been conveyed to Mrs. Mazzeo. As will become apparent, the precise status of the 1994 tax liability lien at the time of the November 27, 1996 assessment and during the period leading up to the present day is irrelevant for purposes of resolving this case, so the Court takes no position on that question.

According to the United States, after application of credits including amounts paid or collected during this lawsuit, Mazzeo's 1994 tax liability totals $538,895.90

plus accrued (un-assessed) interest of $384,536.93 as of June 30, 2002, and accrued (assessed) interest of $9,783.85, for a total liability of $933,216.68 as of that date (on which interest continues to accrue). *See* Pl.'s Prop. Findings of Fact ¶ 8.

The Chapter 11 bankruptcy case was converted to a Chapter 7 liquidation case on October 27, 1997. *United States v. Mazzeo,* 245 B.R. 435, 438 (E.D.N.Y.1999). On October 14, 1997, the Bankruptcy Court issued an Order which relieved the United States from the automatic stay with respect to its Responsible Person Claim against Mazzeo; this Order allowed the United States to undertake an action to determine the extent of Mazzeo's liabilities under this Responsible Person Claim. It provided that if such action was commenced in the Eastern District of New York, the issues would be completely resolved as between the debtor and third parties over which the Bankruptcy Court had no jurisdiction, and that resolution of this issue in another forum should not impede the continuation of the debtor's bankruptcy case. *Id.* Consistent with this Order, the United States instituted an action in this district, Case No. CV–97–6325, before Judge Wexler. That case was dismissed without prejudice in an order dated October 7, 1999, and there has been no further resolution of the relevant issues between Mazzeo and the United States.

Mazzeo received his discharge in bankruptcy on February 28, 1998. On April 21, 1998, the United States instituted this fraudulent conveyance action. Mazzeo died on July 9, 1999. On September 30, 1999, Judge Seybert denied the parties' cross-motions for summary judgement. *United States v. Mazzeo,* 245 B.R. at 444.

---

**4.** This Section applies to cases commenced after October 22, 1994. *Bigelow v. C.I.R.,* 65 F.3d 127, 129 n. 2 (9th Cir.1995).

The United States amended its complaint on January 18, 2001. [Doc. No. 90].

## II. FINDINGS OF FACT AND CON-CLUSIONS OF LAW MADE AT TRIAL

In May and June, 2002, this jury-waived case was tried before this Court, with the parties and their witnesses in the courthouse in Central Islip, New York, and the Court seated in Massachusetts. This was accomplished through video-conferencing,[5] which would not have been possible without the able and invaluable assistance of Maria Perrone, at that time a courtroom deputy clerk in the Eastern District of New York.

After a lengthy and exhaustive trial—it became necessary to call each and every subcontractor who worked on Mazzeo's home to testify that he had actually worked at the property on 41 Post Road and had been paid by check, because Mrs. Mazzeo refused to stipulate as to the different checks, their amounts, to whom they were paid, and from whom they originated—the Court made the following findings of fact on June 7, 2002, which are paraphrased and numbered below:

> ONE: The property sought in this case by the United States is not part of the bankruptcy estate presently being administered by the Bankruptcy Court, but the property transfers or transactions the United States successfully voids, if any, will be put back into the bankruptcy estate to be administered by the trustee in bankruptcy, Richard L. Stern, and to be dispensed pursuant to the order of the United States Bankruptcy Court, which order is still extant in this case. Even if this case has somehow been closed, the result here will be to put assets back into the estate and to let it be administered in accordance with the laws of bankruptcy, rather than simply to order matters conveyed or paid over to the United States.

> TWO: It was not proven by a fair preponderance of the evidence that Mrs. Mazzeo is or at any material time was complicit in any fraud, if fraud there was, on the part of Mazzeo. The United States also failed to prove that any transfer of assets once in her possession was fraudulent against the United States or any other creditors of Mazzeo.

> THREE: Mrs. Mazzeo's defense of this case under New York Debtor and Creditor Law was not so bereft of merit to require that she be subjected to attorney's fees as sought by the United States.

> FOUR: The United States proved the indebtedness of Mazzeo to it in 1985 and for the 1994 tax liability, as stated [in the text] above.

> FIVE: Mrs. Mazzeo, through her counsel, has the right to reduce the amount of Mazzeo's 1994 Responsible Person Liability, if she is able, in this forum. The Court erred when it excluded the testimony of her witness, Accountant Harvey Mendelsohn. Mr. Mendelsohn may submit an affidavit detailing to what he would have testified regarding this matter.

> SIX: The United States is limited in any recoveries that it obtains to the transfers pleaded with particularity in its First Amended Complaint, (i.e., one transfer in Count I; and the distinct transfers listed in Counts II and III). In addition, the United States is limited in its recovery to those transfers which have been demonstrated by actual checks that were received in evidence. Therefore, if particular transfers detailed in Counts II and III are not

5. For a further description of the efficacy of this technique, see *Andrea Doreen, Ltd. v. Building Material Local Union 282,* 250 F.Supp.2d 107, 111 n. 4 (E.D.N.Y.2003).

backed up by checks admitted in evidence, the United States has failed in its proof.

SEVEN: Regarding all of the transfers detailed in Counts II and III, the United States has proven by a fair preponderance of the evidence that each of these transfers was made without fair consideration from Mrs. Mazzeo. The duty to support a spouse does not set up any antecedent debt to trump the fraudulent conveyance law of the State of New York and the need for consideration.

EIGHT: Regarding all of the transfers in Counts II and III, the United States has met its burden in proving by a fair preponderance that each and every one of them was actually fraudulent and made with a direct intent to defraud such creditors that Mazzeo then had and to obstruct and hinder their ability and right to obtain payment. Therefore, the transfers in Counts II and III were actually fraudulent under Section 276.

NINE: The recovery, (which will go to the trustee and not directly to the United States, as detailed above,) on each of the transfers in Count III—life insurance premiums paid, mortgage interest, cash transfers converted to personalty, etc.—is limited to the actual cash amount of the transfer with statutory interest for fraudulent transfers under the laws of the State of New York. To the extent that Mrs. Mazzeo has the personalty, i.e. the jewelry, that was a result of any of these transfers, her duty cannot exceed returning the jewelry to the trustee and the trustee may seek to repossess this jewelry after the Court enters its written order. Mrs. Mazzeo is prohibited from transferring, subordinating or obligating any of this jewelry. It must be held for the bankruptcy trustee.

TEN: Mrs. Mazzeo in good faith took the proceeds from her husband's life insurance policies and transferred them into an annuity. The trustee cannot recover the insurance policies/annuity.

ELEVEN: As for Count II, given that the improvements are the result of fraudulent transfers of Mazzeo, these fraudulent transfers result necessarily in a lien against the house in favor of the trustee, in the aggregate amount of the transfers plus interest at the New York State statutory rate for fraudulent transfers.

TWELVE: Regarding Count I, the Court placed no weight on the testimony of Mrs. Mazzeo that, during the period of their engagement, it was agreed between herself and Mazzeo that the house would always be in her name.

THIRTEEN: Regarding Count I, given that Mazzeo's business had collapsed in August 1985, the Court draws the reasonable inference that Mazzeo knew that numerous creditors were looming and waiting to collect their debts in December 1985, when he transferred the home to Mrs. Mazzeo.

FOURTEEN: Regarding Count I, Mrs. Mazzeo proved by a fair preponderance of the evidence that Mazzeo was solvent at least with respect to the extent of the accrued liability he owed to the United States when the home was transferred. He could have laid his hands on enough disposable assets that would have satisfied that debt. It is a reasonable inference that there were other debts extant at this time, but none of them were proven on the record, so Mazzeo was solvent for the purposes of Section 273.

FIFTEEN: Notwithstanding the fact that Mazzeo was not guilty of constructive fraud because he was solvent when the home was transferred, Mazzeo was guilty of actual fraud under Section 276 when he transferred the home to his wife.

SIXTEEN: The state of Mrs. Mazzeo's title in the house was voidable, not void or *void ab initio*. It was effective against all the world except for those creditors who could demonstrate that the transfer of the title was fraudulent. The United States has done so here. The debt owed to the United States at the time of the transfer, however, was fully satisfied. The title of Mrs. Mazzeo in the property ripened into title absolute even as against the United States once the debt that could have made it fraudulent and voidable was paid off. The Court finds that it was paid off. Even so, all improvements poured into the house are fraudulent and they result in a lien in favor of the trustee.

SEVENTEEN: The equitable defense that Mrs. Mazzeo ought be allowed to remain in the home and that the home ought be the security for the United States's lien was rejected. If the home can be sold for sufficient money as the Court has established and those funds, once back in the hands of the trustee, are used to pay off the United States and, first in priority, the bank holding the mortgage, which is a matter for the bankruptcy judge and not for this Court, then Mrs. Mazzeo can redeem the house.

EIGHTEEN: To the extent that a number of the checks in Count II represent personalty and not fixtures, (this personalty consisting of jewelry, elephant tusks, a rare corkscrew, and other items, as shown at trial), Mrs. Mazzeo's liability is only for the cash amount of the transfer, which is what is fraudulent, plus interest at the New York State statutory rate for fraudulent transfers. She may satisfy that liability by turning over the personalty.

NINETEEN: The fixtures in the home, the improvements, are subject to a lien against the house. The bankruptcy trustee, Mr. Stern, may seek to execute on that lien and sell the house, and then the funds will be held subject to the order of the bankruptcy judge.

TWENTY: The Court, responding to a question from defense counsel, declined to hold from the bench exactly what the conveyances in Counts II and III were properly to be termed: whether embezzlement, *ultra vires*, income, or a loan, they were in his possession, were fraudulent as to creditors, and were a lawless reduction to possession.

*See* 6/07/02 Trial Tr., at 3–19, 53–54. The Court now elaborates upon and further clarifies these findings, and addresses questions brought up by the parties at trial and in subsequent post-trial motions. Moreover, the Court, upon further reflection, finds it necessary to revise a number of these findings so, to the extent this opinion is inconsistent with prior findings, it supercedes them.[6]

## III. DISCUSSION

The Court notes at the outset that the validity of the conveyances properly is governed by New York state law, in this case sections of the New York Debtor and Creditor Law. *United States v. McCombs*, 30 F.3d 310, 323 (2d Cir.1994) (citing *Aquilino v. United States*, 363 U.S. 509, 512–13, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960)).

---

**6.** The most significant revisions are as follows: First, the Court wrongly believed that any voiding of transfers would place the transferred property in Mazzeo's bankruptcy estate. *See* Finding Nos. 1, 9, 10, 11, 17, 19, *supra*. Second, the Court has revised its understanding of the relevant burdens of proof. *See* Finding Nos. 7, 8, 14, *supra*. Third, the Court's description of the United States' recovery was at times incomplete or incorrect. *See* Finding Nos. 9, 11, 16, 18, *supra*. Fourth, the Court has revised its finding that the 1984 tax debt was satisfied. *See* Finding No. 16, *supra*.

## A. Constructive Fraud Under Section 273

█ Under Section 273 of New York Debtor and Creditor Law, a conveyance made by a person that is or will be rendered insolvent is fraudulent as to creditors, without regard to actual intent, if it is made without fair consideration. *See* note 2, *supra.* Generally, therefore, the party challenging the conveyance must prove at trial that: 1) the conveyance was made; 2) the transferor was or would become insolvent at the time of the conveyance; and 3) the conveyance was made without fair consideration. The party challenging the conveyance usually bears the initial burden of proof as to solvency and lack of consideration, *American Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 191 A.D.2d 690, 595 N.Y.S.2d 537, 538 (2d Dep't 1993); however, under New York law, once it is established that a debtor transferred property without fair consideration, the law presumes that the transfer rendered debtor insolvent and the burden of production then shifts to the party seeking to uphold the conveyance to overcome that presumption by producing evidence of the debtor's continued solvency after the transfer. *Cadle Co. v. Newhouse*, 2002 WL 1888716, at * 5 (S.D.N.Y. Aug.16, 2002); *United States v. Red Stripe*, 792 F.Supp. 1338, 1342 (E.D.N.Y.1992); *Shelly v. Doe*, 249 A.D.2d 756, 671 N.Y.S.2d 803, 805 (3d Dep't 1998).

█ The Court ruled from the bench that none of the conveyances in any of the Counts was supported by fair consider-

ation. The Court further held that Mrs. Mazzeo *was* able to prove that Mazzeo was not rendered insolvent when he conveyed the home as detailed in Count I. The Court did not discuss solvency relating to Counts II and III on June 7, 2002, when it made its preliminary findings, but will address this issue below.[7]

### 1. Solvency

█ Solvency under Section 271 is a "balance sheet test," which requires a showing that the debtor's assets, if sold for fair value (not book value), would be equal to or greater than the liabilities. *E.g., Morgan Guar. Trust Co. v. Hellenic Lines Ltd.*, 621 F.Supp. 198, 220 (S.D.N.Y.1985). A witness's testimony concerning the value of assets must be deemed reliable by the court before it can be used to establish fair salable value. *See In re Manshul Constr. Corp.*, 2000 WL 1228866, at *40 (S.D.N.Y. Aug.30, 2000).

Based on Mazzeo's deposition testimony in his bankruptcy proceedings, *see* Pl.'s Ex. 39, referred to by Mrs. Mazzeo in submissions by her counsel to this Court, and other evidence presented at trial, the Court is satisfied that Mrs. Mazzeo met her burden in proving solvency regarding Count I. Mazzeo testified to the ownership of partnership interests in several companies, his possession of (an admittedly small) equity in a furnished condominium in Florida (his $40,000 estimate came from the fact that he sold the condo for $130,000 in 1987, after failing to meet payments on

---

7. Discussing the reasoning behind finding constructive fraud regarding Counts II and III but not Count I may seem irrelevant, given that the Court held that Mazzeo was liable for *actual* fraud when he made all of the conveyances at issue. The discussion is actually of some importance, however, because although all of the transfers in those Counts were fraudulent against contemporaneous creditors (including the United States as creditor on the 1984 tax liability), it may be that none of them

could be fraudulent as against the United States as creditor on the 1994 tax liability until Mazzeo actually knew that the United States was or would soon be a creditor in that capacity. As will become clear, the determination that the transfers were constructively fraudulent obviates any need for the Court to decide that legal question or to determine the date on which the transfers began to be actually fraudulent as against the later debt to the United States.

his obligation for a five-year, $90,000 note on the property), a car, and other assets. While Mazzeo may have overestimated his asset value in his deposition, his testimony establishes a fair amount of assets sufficient to meet a debt of approximately $60,000 (the tax liability plus interest and penalties) on December 11, 1985. The Court therefore held that he had sufficient assets to satisfy his debts to the IRS when he conveyed the home in December 1985, even including any possible accrued interest and late penalties on his tax liability and his monthly mortgage payments, and that Mrs. Mazzeo had therefore proven that Mazzeo was solvent for the purposes of this transfer.

When it made its factual findings from the bench, the Court neglected to address whether Mrs. Mazzeo was able to meet her burden of producing evidence that Mazzeo was solvent when he made the transactions in Counts II and III. The Court now holds that she did not. The conveyances made from 1994 to 1997 rendered Mazzeo insolvent as to his existing debt to the United States, not to mention the numerous other debts that he had incurred by this time. The Court bases this ruling on the evidence the United States gave of Mazzeo's substantial, indeed astronomical, 1994 tax liability, and on the fact that Mazzeo had been involved in different bankruptcy proceedings under three distinct chapters from 1995 to 1997, with his first proceeding being dismissed due to his exceeding the statutory limitation regarding unsecured debts.[8] Mrs. Mazzeo presented little or no evidence of Mazzeo's financial situation and the salable value of the assets in his possession at this time to possibly allow any competent court to conclude that Mazzeo was solvent when the conveyances in Counts II and III were made. He was completely mired in debt, far over

his ability to pay. Mrs. Mazzeo attempts to argue that the Court must determine that Mazzeo was insolvent at *each* and *every* time he wrote a check when evaluating the numerous transactions over a period of roughly three years in Counts II and III; an ingenious and creative argument that ignores (admittedly sparse) case precedent and, in any event, misses the larger point entirely.

■ Mazzeo, this Court has found, undertook an intentional and concerted effort over a period of years to effectuate a scheme for hiding his assets from creditors that he knew would place him beyond the ability to pay his debts. He thereby rendered himself insolvent. Given the size of his tax liability and other debts in 1994, he was completely insolvent well before he first declared bankruptcy, and the largest asset he possessed, his home, was no longer in his name. The Court need not, however, comb through Mazzeo's financial statements and engage in a convoluted accounting process, as Mrs. Mazzeo's counsel would have it. Even if the conveyances were not part of an actually fraudulent scheme, Mazzeo's estate is accountable if it can be proven that Mazzeo engaged in a prolonged asset avoidance scheme involving constructively fraudulent conveyances. If Mazzeo is found to have deliberately rendered himself insolvent through a continuing scheme, even if he lacked any intent to hinder, delay, or defraud creditors, *each* and *every* conveyance made in furtherance of the scheme is void. Given the net result here, Mazzeo properly is considered insolvent retroactively as to each such conveyance as matter of law. As one court ruled when presented with the identical argument for separate findings of insolvency as to each transaction in a series of conveyances:

8. Even if the Bankruptcy Court dismissal lacked preclusive effect, an issue the Court

need not reach, the dismissal is certainly probative of Mazzeo's financial status at the time.

Each transfer does not constitute a separate cause of action, as urged by defendants; it is the whole series of transfers which is actionable where it results in the transferor's insolvency or where it is made with actual intent to defraud, since it may be only the aggregate of all which renders the transferor insolvent or establishes actual intent to defraud, while one or more, taken alone, may not have this result.

*Gruenebaum v. Lissauer*, 185 Misc. 718, 57 N.Y.S.2d 137, 145 (N.Y.Sup.Ct.1945), *aff'd* 270 A.D. 836, 61 N.Y.S.2d 372 (1st Dep't 1946).

This Court ruled from the bench that all the conveyances in Counts II and III were constructively and actually fraudulent. The Court was not at that time thinking of the issues raised by the possibility that the transfers could be fraudulent as to one, but not the other, of Mazzeo's federal tax debts, nor was it considering the possibility that the appropriate treatment of a series of related transfers might be different, depending on whether the claim was for actual fraud or for constructive fraud.

As the Court has made clear, all of the transfers in Counts II and III were part of a continuing course of conduct designed to maintain Mazzeo insolvent. It seems reasonable to make any transfer falling within that scheme actionable by any creditor injured thereby, even if Mazzeo did not know that that person would be a creditor at the time the scheme began. Had Mazzeo acted lawfully, all of the money conveyed pursuant to the scheme should have been available for creditors as their debts came into existence, so "relating back" is appropriate, regardless of when during his course of conduct Mazzeo became aware that a particular person might become his creditor (and thus be injured by his actions). Thus any creditor injured during the pendency of Mazzeo's scheme should be considered a "present creditor" as of the scheme's commencement. The Court will explain below why actual fraud should perhaps receive different treatment.

## 2. Fair Consideration

██ The more important issue of fair consideration has been argued at length. Mrs. Mazzeo maintained at trial that fair consideration was present in all of the conveyances listed in Counts I–III because of an antecedent debt that constituted fair consideration under Section 272—i.e., the obligation of spousal support Mazzeo had as her husband. Under New York law, this is plainly not the case, but because past precedent is confusing on this point, the Court includes the following analysis to clarify the issue.

The Court held, correctly, that the duty to support a spouse does not set up any antecedent debt to trump the fraudulent conveyance law of the State of New York and the need for fair consideration, and it further held that the house did not constitute consideration for Mrs. Mazzeo's promise to marry Mazzeo. The Court specifically noted that it did not credit the testimony of Mrs. Mazzeo that Mazzeo had promised to put his home in her name before they were married, to give her a sense of security after a previous failed marriage. The Court based its finding on the fact that the deed to the home given to Mrs. Mazzeo stated it had been conveyed "for love and affection." Thus, the transfer failed to create any antecedent debt that might constitute fair consideration.

The Court did not explain from the bench the reasons for finding lack of consideration for the transfers in Counts II and III. To succeed in her argument, Mrs. Mazzeo must present evidence both that the transfers constituted spousal support, and that the duty of spousal support creates an antecedent debt, the discharge of which would constitute consideration for the transfers. This Court is skeptical that

all of these transfers can be considered spousal support. Certainly, the payment of mortgage interest and life insurance premiums might well qualify as spousal support. Many of the conveyances in Counts II and III, however, were simply an attempt to add luxuries to an already adequate home. Rather than resolve questions as to which transfers qualified as spousal support, an inquiry that would require a close examination of New York's necessaries law and related doctrines, the Court assumes, *arguendo*, that all the transfers constituted support, because even if they did, they still would not create an antecedent debt that would constitute consideration under the New York Debtor and Creditor Law.

■■ To shed light on the legal bases for its ruling from the bench, the Court now analyzes existing New York law regarding the use of the existence of antecedent debt derived from the obligation of spousal support to shield third party creditors from fraudulent conveyances. As a general proposition, under New York law "[l]ove and affection are inadequate consideration under the [Debtor and Creditor Law]." *Hickland v. Hickland*, 100 A.D.2d 643, 472 N.Y.S.2d 951, 954 (3d Dep't 1984), *appeal dismissed* 63 N.Y.2d 951, 483 N.Y.S.2d 1027, 473 N.E.2d 44 (1984); *see also Apple Bank for Sav. v. Contaratos*, 204 A.D.2d 375, 612 N.Y.S.2d 51, 52 (2d Dep't 1994). There is also no basis under New York law to conclude that a husband owes an antecedent debt for the purposes of Section 272's definition of fair consideration *solely* based on the existence of a marital relationship. *See Manshul Construction Corp.*, 2000 WL 1228866, at *49, and cases cited.

The cases Mrs. Mazzeo cites as "establishing" that the obligation of spousal support somehow automatically creates an antecedent debt between two spouses for the purposes of Section 272 actually do nothing of the kind. First, one of the principal cases she cites for this position, *Vinlis Construction Co. v. Roreck*, 67 Misc.2d 942, 325 N.Y.S.2d 457, 462 (N.Y.Sup.Ct. 1971), misapplies the main precedent it cursorily cites to state that antecedent debt may arise out of the spousal duty to support. That main precedent, *Safie v. Safie*, 24 A.D.2d 502, 261 N.Y.S.2d 993 (2d Dep't.1965) affirmed, essentially without opinion, a judgment holding that a debtor husband's transfer of certain real property to his wife, from whom he was living separately. In *dissent*, two justices urged that the judgment should not be affirmed, because the relationship of a husband and wife cannot by itself give rise to debtor-creditor status. *Id.* at 994 (Christ, J. & Rabin, J., dissenting). The New York Court of Appeals decision in this matter, *Safie v. Safie*, 17 N.Y.2d 601, 268 N.Y.S.2d 561, 562, 215 N.E.2d 682 (1966), makes clear that the holding of antecedent debt was based on the fact that the debt was created by a prospective *separation agreement* between the parties, who had been living apart for four years. This was also true in *FDIC v. Malin*, 802 F.2d 12, 18–19 (2d Cir.1986), which cited *Vinlis* and *Safie* as support for the proposition that, in a case involving a separation agreement where a husband agreed to convey a home to his ex-wife, the antecedent debt of support as embodied in this agreement constitutes fair consideration.

The key here is that the precedents that Mrs. Mazzeo cites all concern the debt owed a spouse *as the result of a separation or divorce agreement*, that is, during the dissolution or anticipated dissolution of a marriage, and do not concern the ongoing duty of support in an intact marriage, as here. Therefore, the "extreme proposition" that Mrs. Mazzeo advocates simply is not supported by New York law to any meaningful degree, which is "particularly telling ... [given] the frequency with which interspousal conveyances must un-

doubtedly occur." *Cadle Co. v. Newhouse*, 2000 WL 1721131, at *5 (S.D.N.Y. Nov.16, 2000). It is certainly sensible to treat intact marriages and dissolving marriages differently from this standpoint, and it is hardly surprising that New York law does so.

Mazzeo canceled no pre-existing debt when he made any of the conveyances at issue in this case. The Court finds there was none. Nor did he receive anything of value from Mrs. Mazzeo. In analyzing this issue directly, the Southern District of New York made the following policy argument against allowing spousal support to be taken automatically as an antecedent debt and thus constituting fair consideration:

> [Under a rule that allowed as much,] any spouse could transfer substantial assets to the other spouse and simply call it a transfer in return for consideration and shelter the assets from creditors. There is no such loophole. As the Court of Appeals for the Second Circuit explained in a related context, [under such a rule], a potential spouse "could empty his estate with impunity when sued by victims, transfer his property to his fiancee and receive nothing but inchoate interests in return—nothing from which [a creditor] could recover its judgment— and yet enjoy the benefits of the property now nominally owned by his wife. That is the sort of injustice fraudulent conveyance law is designed to prevent."

*Manshul Construction Corp.*, 2000 WL 1228866, at *49 (quoting *HBE Leasing*

*Corp. v. Frank*, 61 F.3d 1054, 1059 (2d Cir.1995)). The Court agrees that it strains concepts of basic fairness to ask it to conclude, as matter of law, that *any* transfer by a husband to his wife is *automatically* made for fair consideration simply because the husband has an obligation to support his spouse. Mrs. Mazzeo's arguments in this regard are emphatically rejected and this Court finds that no fair consideration existed for *any* of the transfers listed in Counts II and III.

### B. Actual Fraud Under Section 276

■ The Court held that all of the conveyances in Counts I–III were actually fraudulent as defined under New York Debtor and Creditor Law Section 276. To claim actual fraud successfully, the creditor (here the United States) must meet its burden of proof to establish that a conveyance was made with actual intent to delay, hinder, or defraud creditors under Section 276, and under New York law the standard for such proof of actual intent is clear and convincing evidence. *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir.1994); *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17, 20 (2d Dep't 1986). Mrs. Mazzeo's counsel, at the conclusion of the June 7, 2002 findings of fact and conclusions of law, correctly pointed out that the Court had used the incorrect standard of proof, a fair preponderance rather than clear and convincing evidence, when evaluating whether the United States had met its burden in proving an actual intent to delay, hinder, or defraud creditors, as Section 276 requires.[9]

---

9. No objection was made by either party at trial to the Court's applying the fair preponderance standard to the United States' contentions that a debt existed and that fair consideration was lacking, and to the question of solvency. The Court notes that, in the absence of fair consideration, Mrs. Mazzeo bore the initial burden of production on this question. New York law specifies that the clear and convincing standard is the proper standard for proving actual fraud, but has not determined what standard a party must meet in proving insolvency or lack of fair consideration or solvency, *see Cadle Co.*, 2002 WL 1888716, at *5 n. 5. The Court need not decide this issue because it would hold under either standard that a debt existed, that there was no fair consideration, and that, with re-

▇▇▇▇ Upon reflection, the Court now holds that it was in error when it used the fair preponderance standard, but that the error was immaterial, because even under the heightened standard of clear and convincing evidence the United States resoundingly proved that Mazzeo had an actual intent to hinder, delay, and defraud his creditors when he made the renovations to the home and the other payments described in Counts II and III. "[L]ack of fair consideration gives rise to a rebuttable presumption of fraudulent intent." *United States v. Carlin*, 948 F.Supp. 271, 277–78 (S.D.N.Y.1996) (citing *Atlanta Shipping Corp., Inc. v. Chemical Bank*, 631 F.Supp. 335, 346–47 (S.D.N.Y.1986), *aff'd* 818 F.2d 240 (2nd Cir.1987)). Moreover, "[c]ourts view *intrafamily* transfers without any signs of tangible consideration as presumptively fraudulent." *United States v. Alfano*, 34 F.Supp.2d 827, 845 (E.D.N.Y. 1999) (emphasis added). Mrs. Mazzeo did not overcome the force of these dual presumptions regarding actual fraud at trial.

▇▇▇ Mrs. Mazzeo argues that Mazzeo was not aware of his exact federal income tax liability in 1985 when he transferred his home to his wife, as the IRS did not demand payment until 1987, and that this should be factored in to any finding of actual fraud as to Count I. She argues that Mazzeo was likewise not aware of his specific debt in 1994, payment for which was demanded in 1996. This avails her nothing. First, while knowledge of the existence or extent of debt is surely a factor in determining intent in any fraud case, it is just that—a factor and not a requirement. *See Carlin*, 948 F.Supp. at 277; *Atlanta Shipping Corp., Inc.*, 631 F.Supp. at 346–47. All that must be proven is a contemporaneous intent to hinder, delay, or defraud creditors, either specifically or generally. Venerable precedent in the State of New York holds that when attempting to prove actual and constructive fraud, "[i]t is no longer necessary to establish the existence of the indebtedness as of the date of the conveyance." *In re Haber's Estate*, 151 Misc. 82, 270 N.Y.S. 603, 606 (N.Y.Sur.1934). In any event, Mazzeo was in debt to the IRS both when he conveyed the home in 1985 and when he started his string of fraudulent transactions in 1994, although the Court does not determine when precisely Mazzeo became indebted on the 1994 tax liability. The fact that payment has not yet have been demanded does not mean that debts do not exist or have not accrued.

Moreover, it cannot rationally be claimed that Mazzeo lacked knowledge of his debts. While he had not yet been presented with a demand for payment from the IRS when he transferred his home to Mrs. Mazzeo in 1985, Mazzeo certainly knew he had not paid any income tax for the tax year 1984. More importantly, the Court has already held that, regarding the transfer of his home, in light of the failure of his business, the fact that he was liable at the margin call for certain securities, and the fact that creditors were looming, he transferred his home to his wife without consideration in order to avoid having this asset used to satisfy his debts. The same can be said of the transactions in Counts II and III. Mazzeo again knew that he faced imminent tax problems and, regardless of his debts to the IRS, the considerable level of Mazzeo's other debts during the relevant time period forced him to declare bankruptcy. When doing so, he exceeded the statutorily mandated unsecured debt. In June 1994, Mazzeo knew that creditors were again appearing on the horizon (indeed, his knowledge at this point was far more specific than in 1985), and he sought to shield his assets from creditors through a scheme of pouring

spect to Count I, Mazzeo was solvent at the time of the transfer.

money into a house not in his name, wrongly thinking this would shield those monies.

In addition, a finding of actual fraudulent intent on the part of Mazzeo as to all counts is warranted because, recognizing that direct proof of fraudulent intent as required under Section 276 is usually difficult to obtain, courts applying New York law have held that intent need not be shown by direct evidence, and is normally inferred from the circumstances surrounding the transfer. *E.g., McCombs*, 30 F.3d at 328, and cases cited. In determining the proper method of using circumstantial evidence in this way, New York state and federal courts have concluded that such intent may be inferred from circumstantial evidence, or from the traditional "badges of fraud." *Securities Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 315 (Bankr.S.D.N.Y.1999). Badges of fraud include:

> 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) retention of possession, benefit or use of the property in question [by the debtor]; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and 6) the general chronology of the events and transactions under inquiry.

*(In re Kaiser) Salmon v. Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir.1983); *see also McCombs*, 30 F.3d at 328; *Cadle Co.*, 2002 WL 1888716, at * 5; *Bulkmatic Transp. Co. v. Pappas*, 2001 WL 882039, at *11 (S.D.N.Y. May 11, 2001); *RTC Mortgage Trust v. Sopher*, 171 F.Supp.2d 192, 201 (S.D.N.Y.2001); *Murkoff*, 508 N.Y.S.2d at 22; *Twyne's Case*, 3 Coke 806, 76 Eng. Rep. 809 (Star Chamber, 1601).

The Court inferred Mazzeo's actual fraudulent intent based on the evidence presented. Many of the badges of fraud set out above were present in this case: the transferor and transferee were married; the consideration was inadequate (indeed, nonexistent); there was a "pattern" of activity as evidenced by the transactions in Counts II and III after a large debt had been incurred; and Mazzeo retained the "benefit" and "use" of the home,[10] if not "control" of it, by continuing to live there.

An important analytical issue remains. There can be little doubt that all of the transfers in Counts II and III were actually fraudulent as against the United States, as creditor on the 1985 tax liability. It may be, however, that New York law would not be willing to charge Mazzeo with actual fraud as against the United States, as creditor on the 1994 tax liability, until the time when he *actually* knew that the United States would be a victim of his fraudulent scheme. To be more precise, New York law might not be willing to treat the United States, as creditor on the 1994 liability, as a "present creditor" until Mazzeo actually knew that the United States would be his creditor in that capacity. The heightened proof and pleading requirements for actual fraud suggest that courts should be much more careful in ascribing actual, rather than constructive, fraud to a debtor.

If this is in fact the law, and the Court seeks to charge Mazzeo with actual fraud, then the Court must determine as of what date Mazzeo can be charged with knowing that he would have the United States as a

---

**10.** Mazzeo paid all construction and mortgage costs—Mrs. Mazzeo testified that she knew nothing about how expenses for the home were paid, even though the house was in her name.

creditor for the 1994 liability. This date must be at least as early as December 21, 1995, the date that Mazzeo filed for Chapter 13 in anticipation of the New York assessment. It might even be as early as December 31, 1994, the end of the tax year for which Mazzeo would be charged with his Responsible Person Assessment, or earlier. Westfield went out of business at the end of 1994, Pl.'s Ex. 39, at 32, so it would be surprising if Mazzeo, who as an officer knew of Westfield's high federal tax debts, did not know that the United States was about to become his creditor again.

Fortunately, the Court need not reach the questions whether the United States' later tax debt can be "related back" to the earliest of the transfers under an actual fraud theory, and as of which date Mazzeo can be charged with "actual knowledge" of the United States as a creditor, if that is required, because the United States can reach all of the transfers in Counts II and III under constructive fraud, as discussed above.

## C. Liability to Future Creditors Under Sections 276 and 278

Section 276 states flatly that any conveyance found to be actually fraudulent "is fraudulent as to both present and future creditors." *Id.; see* note 2, *supra.* This is a broad statutory grant and has been interpreted as such: "[T]he plain language of the statute reaches ... conveyances which occurred prior to the time the obligation to the plaintiff arose." *JR & J Holding Co. v. Rabinowitz,* 201 A.D.2d 535, 607 N.Y.S.2d 724, 725 (2d Dep't 1994); *see also United States v. Cohn,* 682 F.Supp. 209, 217 (S.D.N.Y.1988); *In re Rosenfield's Will,* 213 N.Y.S.2d 1009, 1015 (N.Y.Sur.1961). The United States relies on this section when it argues that the transfer of the home to Mrs. Mazzeo should be voided, as Mazzeo conveyed it to her with an actual intent to defraud the United States as to his 1984 debt. The

United States seeks, therefore, to execute its lien on the entire house and to take all of its value, not simply to collect on the fraudulently conveyed assets that can be traced into it.

Section 278, however, provides an exception to the general rule found in Section 276:

1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, *when his claim has matured, may,* as against any person *except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase,* or one who has derived title immediately or mediately from such a purchaser,

 a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

 b. Disregard the conveyance and attach or levy execution upon the property conveyed.

2. *A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.*

N.Y. Debt. & Cred. Law § 278 (emphasis added).

Section 278(1) sets up a "bona-fide purchaser" exception to the general rule of Section 276 that a conveyance found to be actually fraudulent is void against present and future creditors. *See Malin,* 802 F.2d at 16–18. Sections 276 and 278 are not in conflict; the latter merely modifies and restricts the other.

Mrs. Mazzeo is unable to utilize the bona-fide purchaser defense because she did not provide fair consideration as a transferee. Part (2) of Section 278 makes clear that a transferee who received a conveyance without providing fair consideration *may* retain the property as securi-

ty for repayment of the consideration furnished, however inadequate. This is a further limitation on Section 276's broad grant and is best termed an equitable defense to seizure. Mrs. Mazzeo argued at trial that she should be allowed to keep the home as security for her husband's debts, citing the hardship involved in moving, and the Court rejected this defense. Mrs. Mazzeo furnished no consideration for the home, and a defense based on Section 278(2) avails her nothing.

██ New York decisional law, however, goes further than this statutory limitation and holds that a conveyance will not be held to be fraudulent against subsequent creditors unless the grantee herself received it with an intent to defraud, or participated in such fraud. *Durland v. Crawford,* 183 A.D. 763, 171 N.Y.S. 135, 137 (3d Dep't 1918); *see Bein v. Baer,* 7 Misc.2d 543, 162 N.Y.S.2d 676, 677–78 (N.Y.Sup.Ct.1957); *In re Campbell's Estate,* 164 Misc. 632, 299 N.Y.S. 442, 450 (1937). Despite their age, these cases remain good law for this proposition. *See* 30 N.Y. Jur.2d *Creditors' Rights and Remedies* § 397 n. 79 (confirming *Bein*'s continuing validity). The *Bein* case is particularly on point. *Bein* concerned a husband and wife's motion to dismiss a complaint that the husband had fraudulently conveyed, *without consideration,* mortgage payments, improvements, and expenses upon realty owned by his wife, to hide funds from creditors. 162 N.Y.S.2d at 677. The motion was denied and the court highlighted the intent of the grantee as a matter to be determined at trial, interpreting Section 276 to mean that "[a] conveyance made with an *actual and contemporary intent* to defraud subsequent creditors may be challenged for fraud and set aside by them where the grantee participated in such fraud." *Bein* 162 N.Y.S.2d at 677–78. This Court held that Mrs. Mazzeo received the home (and, indeed, *all* the conveyances to her in this case) without the intent to defraud, and did not actively participate in any fraud. Under New York case precedent, however sparse, her home is therefore protected from *future* creditors. The United States is certainly a future creditor as to the 1994 tax liability, which did not accrue until roughly a decade after the 1985 transfer. It was a then-present creditor, however, with respect to the 1984 tax liability.

## 1. The 1984 Tax Liability

The Court, in its preliminary findings, indicated that Mrs. Mazzeo's title had been perfected and had ripened into title absolute when the 1984 liability was extinguished; the Court based its finding that the 1984 tax debt was satisfied on the fact that the evidence showed the *assessed* balance to be zero. Pl.'s Ex. 31.

██ The United States has presented evidence to the Court both during and after the trial that the debt was not satisfied and that the zero balance in Exhibit 31, a Certificate of Record that attaches Certificates of Assessments and Payments for the 1984 Tax Year, only refers to *assessed* taxes and not to *accrued* additions such as interest and penalties. The confusing fact that such a form can show a zero balance when the taxpayer still owes money in the form of interest and penalties is explained by the fact that, unlike most creditors (such as banks or graduate student loan providers), and true to the popular image of its irrationality, the IRS does not apply payments first to interest and then to principal. Rather, the IRS applies payments to collection costs, principal, penalty, and interest, in that order. *See* Rev. Proc. 84–58, 1984–2 C.B. 501, 1984 WL 260577; Rev. Proc. 82–51, 1982–2 C.B. 839, 1982 WL 196390; Rev. Rul. 79–284, 1979–2 C.B. 83, 1979 WL 51035; Rev. Rul. 73–305, 1973–2 C.B. 43,

1973 WL 32999.[11] Interest accrues on federal tax liabilities by operation of statute, and the amount owed is matter of law. *See* I.R.C. §§ 6601(a) & (e)(2); *United States v. Schroeder*, 900 F.2d 1144, 1150 n. 5 (7th Cir.1990); *Greenhouse v. United States*, 780 F.Supp. 136, 142 n. 14 (S.D.N.Y.1991). Further, pursuant to I.R.C. §§ 6601(a) & 6622, the IRS only assesses these accrued interest and penalty liabilities once the *principal* that formed the liability in the first place is paid. *See* I.R.C. § 6601. In short, additional accruals will be assessed only when a payment is made in an amount sufficient to satisfy prior assessments. Here, the assessed balance (the principal) was satisfied on December 6, 2000, with approximately $34,000 paid in addition. After deducting $4,000 in the capped late penalty, the IRS used the rest to absorb accrued interest. Much more is still owed, but the remainder of the accrued interest will only be assessed (and become known) *when, and only when, another payment is made.* Pressed by the Court, however, the United States has arrived at a figure of $134,551.57 still owed on the 1984 liability in accrued interest, as of June 30, 2002, none of which has yet been assessed. For purposes of discussion only, the Court accepts this proffer. The Court notes, however, that the United States' proffer constitutes an admission that, as of June 30, 2002, the amount owed on the 1984 liability was no more than that.

■ There were two tax liabilities in this case, and Mazzeo's estate was making ongoing payments on both. The United States' own evidence shows that Mazzeo's estate made payments pursuant to a settlement and levy of $161,202.40 on August 11, 2000, and $40,000 on November 3, 2000, *more than enough* to satisfy the mystical and hidden accrued interest penalties detailed above on the 1984 liability; the United States, however, applied much of the money paid to the 1994 liability, not the 1984 liability. Pl.'s Ex. 31; Pl.'s Ex. 32 (Certificate of 1994 Responsible Person Liability). These payments were undesignated, and could have gone towards satisfying either liability. The IRS does not necessarily apply involuntary payments to the oldest debt first, as this case makes clear, and while 26 U.S.C. § 6342(a)(3) requires that proceeds from federal tax levies go to the liabilities for which the levies were issued, the IRS had two valid levies in this case and, as the payments were undesignated, it chose to apply them to the 1994 liability. In fact, by its own admission, it did this deliberately, because it was advised by the Department of Justice that it was in the United States' best interest to preserve the 1984 tax liability in order to maximize the United States' right to continue challenging the 1985 conveyance (though it went against this recommendation for some reason and allowed certain of the 2000 payments to be applied to the 1984 liability).

The United States arguably has authority to do this under Policy Statement P–5–60, which permits the United States to apply as it sees fit any involuntary payments or nondesignated voluntary payments, at least where Responsible Person Assessments are involved. *See* Policy

---

**11.** The latter two Revenue Rulings have been superceded by a later Revenue Procedure that does not apply to this case. *See* Rev. Proc. 2002–26, 2002–1 C.B. 746, 2002 WL 545245. The Court notes that the United States also pointed to Internal Revenue Manual § 56(18)1 as evidence of its procedures for applying tax payments. The Internal Revenue Manual has a new numbering system, so the United States' citation is obsolete, and the Court is not clear where, if anywhere, the cited provision appears in the new version, but the Revenue Rulings and Procedures cited provide sufficient evidence of the United States' practice.

Statement P–5–60, *reprinted in* 1 *Internal Revenue Manual* (CCH) 1303–04. Interestingly, the United States has never in fact mentioned Policy Statement P–5–60, but rather has pointed the Court to a case that mentions the document. *See* Policy Statement P–5–60; *United States v. Schroeder*, 900 F.2d 1144, 1146 n. 1, 1149 (7th Cir.1990). Of course, the *Schroeder* court does not mention the Policy Statement on pages to which the United States actually cites, *see* Pl.'s Mem. at 9 [Doc. No. 157] (citing *Schroeder*, 900 F.2d at 1149), and this suggests that the United States was unaware of the Policy Statement's existence. Looking at other cases discussing the Policy Statement, it appears that on at least one occasion, the United States has not even been able to find a copy of it. *United States v. Shichman*, 2002 WL 393070, at \*3 (E.D.N.Y. Feb.16, 2002). Despite these somewhat disturbing confirmations of popular perceptions about the IRS, courts have consistently assumed that the Policy Statement is valid. *See, e.g., Slodov v. United States*, 436 U.S. 238, 252 n. 15, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978); *Pike v. United States*, 723 F.2d 232, 233 (2d Cir.1983); *Muntwyler v. United States*, 703 F.2d 1030, 1032 (7th Cir. 1983). In any case, Mrs. Mazzeo has had no occasion to challenge the Policy Statement's validity or applicability on, say, administrative law or constitutional grounds, so the Court has no warrant to forbid the Policy Statement's application in this case.

Admittedly, Policy Statement P–5–60's terms do not necessarily extend to this case. It seems to refer more to the application of payments as between trust-fund and non-trust-fund liabilities, for payments that are more or less clearly directed at meeting a Responsible Person Assessment. *See id.* If both the assessments at issue here were Responsible Person Assessments, the case would more definitely reside within the "core" of the rule. *See* H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 Harv. L.Rev. 593, 607 (1958) (describing how, in applying the words of a legal rule, "[t]here must be a core of settled meaning, but there will be, as well, a penumbra of debatable cases in which words are neither obviously applicable nor obviously ruled out").

Even if Policy Statement P–5–60 does not apply in this case, however, the United States has the power to do as it does here. *See Pike*, 723 F.2d at 233 (holding that, in the context of collecting Responsible Person Assessments, "[w]hen taxes have been forcibly collected, as by levy, the taxpayer has no say in allocation of the monies to past due taxes"); *Amos v. C.I.R.*, 47 T.C. 65, 69, 1966 WL 1102 (1966) ("[T]he better rule for Federal tax purposes is to permit the Commissioner's agent to apply involuntary tax payments in the manner he chooses.").[12]

There can be no question that Mazzeo's payments (and the payments made by his estate) have been involuntary; the relevant payments resulted from levies or from participation in litigation. *See, e.g., United States v. De Beradinis*, 395 F.Supp. 944, 952 (D.Conn.1975), *aff'd mem.*, 538 F.2d 315 (2d Cir.1976); *Amos v. C.I.R.*, 47 T.C. 65, 69, 1966 WL 1102 (1966) ("An involuntary payment of Federal taxes means any payment received by agents of the United States as a result of distraint or levy or from a legal proceeding in which the Government is seeking to collect its delinquent taxes or file a claim therefor.").

■ Thus, to the question, "Is our system of government one in which the authorities can, by manipulating application

---

12. A new Revenue Procedure, inapplicable to the present case, more explicitly asserts the United States' right to apply involuntary or undesignated payments to best serve the government's interests. *See* Rev. Proc.2002–26, 2002–1 C.B. 746, 2002 WL 545245.

of tax payments, remove an innocent widow and her child from their home, in order to satisfy a two-decades-old debt for which neither is responsible?," the Court's answer must be a reluctant "Yes." [13]

### D. The Corporate Form of the Checks

■ The fact that the checks used to effectuate all the conveyances in Counts II and III were not personal checks, but rather corporate checks from three different companies, is one of the more problematic issues in this case. Mrs. Mazzeo argues, with some justification, that because the United States did not attempt to "pierce the corporate veil" when it amended its complaint, it cannot prevail on the theory that Mazzeo personally ever owned the funds found to have been fraudulently disbursed. The question whether transfer of corporate funds can, without any piercing of the corporate veil, provide a basis for a fraudulent conveyance case against the principal who transferred them appears to be a matter of first impression in this Circuit. Mrs. Mazzeo proved at trial, however, that Mazzeo was not a shareholder of these companies for most of the relevant period, having transferred his interest in SLMP in 1995 to Unitek, an entity wholly owned by Charles Leonhardt, so it is legally impossible for these monies to have been a constructive dividend. The evidence submitted by the United States at trial, in the form of journal entries prepared by SLMP's accountants, indicates that the SLMP funds were initially set forth as loans to Mazzeo.

The United States glossed over the question of how the funds transferred as alleged in Counts II and III were directly attributable to Mazzeo, and presented very little evidence at trial on this issue despite repeated requests from the Court to do so. The Court declined to answer this question as to how to characterize these disbursements definitively at trial, but now holds that the funds that Mazzeo fraudulently conveyed into his home are properly deemed income to him.

In depositions conducted by the United States in early 1998, Mazzeo outlined the corporate structures of SLMP, Unitek, and United. All three companies were, according to Mazzeo, privately owned companies that engaged in stock trading and consulting. *See* Pl.'s Ex. 39, at 88–92. Mazzeo testified that he viewed roughly $250,000 of the money that came from United and SLMP as "loans," *id.*, but also that $250,000–$280,000 of the money from the two companies was "income." *See id.* at 85–92. He further stated that SLMP had one officer, himself, and that he was "president" of the company. *Id.* at 91. Mazzeo further stated that the sole shareholder in the company (after the 1995 transfer) was Unitek, though SLMP still had its corporate checks, and that Unitek was solely owned by Charles Leonhardt. *See id.*; Pl.'s Ex. 40, at 112–13. Mazzeo traded and consulted for both Unitek and SLMP. Pl.'s Ex. 39, at 88–92. Mazzeo stated in his deposition that he owned 30 percent of the stock in United but that he did not invest any money in the company; rather that he obtained this ownership interest because he "worked for it". *Id.* at 89. He also stated flatly that $300,000 of the $550,000 paid for construction of the second house was "earned" (as opposed to "borrowed"), and that Mrs. Mazzeo had earned somewhere between $20,000 and

---

13. It has long been settled in New York that when an ordinary creditor receives involuntary payments, as through a judicial foreclosure sale, the court will determine the proper application of the funds as between a single debtor's multiple debts based on equitable principles. *See Orleans County Nat'l Bank v. Moore*, 112 N.Y. 543, 547–48, 20 N.E. 357 (1889).

$50,000 of that $300,000. *See id.* at 85–88.[14]

 In his own words, Mazzeo did not invest any money in United, yet he "owned" 30 percent of it. When asked how he came to own 30 percent of a company in which he had invested nothing, Mazzeo replied he was given this interest because he "worked for it"—in other words, as a salary for the trading and consulting work he did. Moreover, Mazzeo had transferred 100% of the SLMP stock to Leonhardt without any consideration detailed in the present record. Still more compelling, he took substantial sums of money out of the two remaining entities without either of these companies uttering a peep of protest, either then or now. It is reasonable, therefore, to infer that Mazzeo was deducting his *salary* when he used these corporate funds. Indeed, Mazzeo himself said he viewed somewhere between $250,000 and $400,000 of the money dispensed by these companies on his behalf as "earnings," which indicates he had the same arrangement with SLMP as he did with Unitek and United. The Court, therefore, holds that, notwithstanding the corporate form of the checks, the dollar amounts represented in these checks were the income of Mazzeo.

## IV. VALUE AND STATUS OF THE FRAUDULENT CONVEYANCES

After the trial was completed, the Court made clear that the United States' recovery would be limited to what it had pled with particularity in its complaint and had properly placed in evidence at trial, i.e., checks from the corporate entities that paid for reconstruction and personalty—admitted in evidence and backed up by witness testimony—traceable into the home:

> The reasonable inference for most of the witnesses produced here, if not all, was that these checks were either directly for construction work and materials that went into the house or for licensing, legal fees and the like that went into the house. That's largely what I'm persuaded of.... So long as they're supported by a check and so long as I have some testimonial evidence that supports it[, the checks will be determined to be fraudulent conveyances].

6/7/02 Trial Tr. at 22–23. With this standard in mind, the Court holds that the following checks, pled with particularity in the United States' amended complaint and properly introduced at trial,[15] constitute fraudulent conveyances:

| | Date | Check No. | Description | $ Amount |
|---|---|---|---|---|
| 1 | 7/5/94 | 1040 | SLMP check to Curto | 4,000 |
| 2 | 7/5/94 | 1041 | SLMP check to Curto | 4,600 |
| 3 | 7/28/94 | 1042 | SLMP check to Curto | 4,300 |
| 4 | 8/9/94 | 1047 | SLMP check to Curto | 10,750 |
| 5 | 9/16/94 | 1062 | SLMP check to Curto | 12,100 |

14. Mazzeo later agreed that he had borrowed roughly $250,000 and earned roughly $350,000–$400,000. Pl.'s Ex. 40, at 118–19.

15. *See* Pl.'s Ex. 9–26, 30, 71. The United States introduced a number of checks as evidence of transactions that it did not plead with particularity in its complaint. The Court does not include these, because they do not satisfy both of the requirements the Court has imposed. The United States has at this point waived any objection to the Court's holding regarding the pleading and evidentiary requirements for recovery of fraudulent conveyances in this case, as it made no mention of that holding in its Post–Trial Memorandum.

| | | | | |
|---|---|---|---|---|
| 6 | 10/6/94 | 1066 | SLMP check to Curto | 12,900 |
| 7 | 12/23/94 | 1077 | SLMP check to Curto | 4,300 |
| 8 | 4/6/95 | 1092 | SLMP check to Corwin & Matthews | 29,000 |
| 9 | 4/17/95 | 1095 | SLMP check to Inc. Vill. of E. Williston | 5,000 |
| 10 | 5/14/95 | 1104 | SLMP check to American Mayflower | 715 |
| 11 | 6/13/95 | 1111 | SLMP check to Curto | 10,000 |
| 12 | 6/23/95 | 1115 | SLMP check to Curto | 25,000 |
| 13 | 7/6/95 | 1123 | SLMP check to Curto | 50,000 |
| 14 | 7/10/95 | 1124 | SLMP check to L.I. Sav. Bank | 2,549 |
| 15 | 10/21/95 | 1154 | SLMP check to Guardian | 403.23 |
| 16 | 10/21/95 | 1155 | SLMP check to Guardian | 198.38 |
| 17 | 10/21/95 | 115 | SLMP check to Guardian | 109.29 |
| 18 | 11/3/95 | 1169 | SLMP check to L.I. Sav. Bank | 2,546 |
| 19 | 11/6/95 | 1171 | SLMP check to Guardian | 403.23 |
| 20 | 11/20/95 | 1176 | SLMP check to Guardian | 99.19 |
| 21 | 12/11/95 | 1188 | SLMP check to Guardian | 403.23 |
| 22 | 12/13/95 | 1061 | Unitek check to Curto | 30,000 |
| 23 | 12/27/95 | 1197 | SLMP check to Guardian | 99.19 |
| 24 | 1/25/96 | 1206 | SLMP check to Curto | 29,000 |
| 25 | 3/25/96 | 92 | Mr. & Mrs. Mazzeo check to Curto [16] | 29,000 |
| 26 | 5/7/96 | 95 | SLMP check to Green Art Plumbing | 5,000 |
| 27 | 5/8/96 | 96 | SLMP check to Merit Woodworking | 7,000 |
| 28 | 6/7/96 | 1007 | SLMP check to Creative Plumbing | 2,600 |
| 29 | 6/30/96 | 1016 | SLMP check to Peter Curto | 3,000 |
| 30 | 7/1/96 | 1017 | SLMP check to Spiros Paxinos | 15,000 |
| 31 | 7/16/96 | 1109 | Unitek check to Curto | 29,000 |
| 32 | 8/8/96 | 1026 | SLMP check to Spiros Paxinos | 5,000 |
| 33 | 8/9/96 | 1027 | SLMP check to Creative Plumbing | 5,300 |
| 34 | 8/27/96 | 1033 | SLMP check to Merit Woodworking | 2,600 |
| 35 | 9/5/96 | 1036 | SLMP check to Curto | 10,000 |
| 36 | 9/6/96 | 1037 | SLMP check to Green Art Plumbing | 5,000 |
| 37 | 9/15/96 | 1044 | SLMP check to Marble House Inc. | 3,000 |
| 38 | 9/15/96 | 1045 | SLMP check to Spiros Paxinos | 6,000 |
| 39 | 10/7/96 | 1053 | SLMP check to Spiros Paxinos | 4,000 |
| 40 | 10/19/96 | 1059 | SLMP check to White Knight | 5,000 |
| 41 | 10/31/96 | 1062 | SLMP check to Pat Bennett | 2,575 |
| 42 | 10/31/96 | 1063 | SLMP check to Elco Door | 1,256 |
| 43 | 11/2/96 | 1064 | SLMP check to Gentil Moving Services | 2,031.50 |
| 44 | 11/2/96 | 1065 | SLMP check to Merit Woodworking | 3,000 |
| 45 | 11/4/96 | 1066 | SLMP check to Mr. Jay | 1,275 |
| 46 | 11/5/96 | 1069 | SLMP check to Assured Rug & Floor Cleaning | 1,500 |
| 47 | 11/6/96 | 1070 | SLMP check to B. Lanzarone Iron Works | 5,250 |
| 48 | 11/8/96 | 1072 | SLMP check to Werner Glass & Mirror | 3,610 |
| 49 | 11/11/96 | 1073 | SLMP check to Jay Appliances | 3,300 |

16. The check, as copied in the record, appears to be from Mr. and Mrs. Mazzeo, but SLMP's records show that it wrote a check of the same number, for the same amount, on the same date, to the same company (Curto). Pl.'s Ex. 10(k). Either way, there is sufficient evidence of a fraudulent transfer.

| 50 | 11/13/96 | 1075 | SLMP check to White Knight | 8,622 |
|---|---|---|---|---|
| 51 | 11/19/96 | 1077 | SLMP check to Green Art | 4,000 |
| 52 | 12/12/96 | 1083 | SLMP check to White Knight | 1,650 |
| 53 | 12/18/96 | 1084 | SLMP check to Mr. Jay | 2,100 |
| 54 | 1/16/97 | 1088 | SLMP check to Designers North Carpet | 3,200 |
| 55 | 1/22/97 | 1090 [17] | SLMP check to R.E. Steele Antiques | 7,500 |
| 56 | 1/28/97 | 1091 | SLMP check to B. Lanzarone Iron Works, Inc. | 10,500 |
| 57 | 1/28/97 | 1092 | SLMP check to Mrs. Mazzeo | 3,000 |
| 58 | 2/1/97 | 1093 | SLMP check to Mr. Jay | 1,820 |
| 59 | 2/5/97 | 1094 | SLMP check to Ciriaco Genova | 6,000 |
| 60 | 2/7/97 | 1095 | SLMP check to Green Art Plumbing | 1,028.14 |
| 61 | 2/18/97 | 001256 | SLMP check to David Bell Antiques | 6,500 |
| 62 | 2/21/97 | 1102 | SLMP check to Rena Fortgang | 11,500 |
| 63 | 3/7/97 | 1109 | SLMP check to White Knight | 2,495.50 |
| 64 | 3/29/97 | 1114 | SLMP check to Designers North | 4,400 |
| 65 | 4/7/97 [18] | 1117 | SLMP check to Designers North | 650 |
| 66 | 4/19/97 | 1120 | SLMP check to Mrs. Mazzeo | 2,000 |
| 67 | 4/30/97 | 1126 | SLMP check to Mrs. Mazzeo | 3,000 |
| 68 | 5/8/97 | 1130 | SLMP check to Hemmingway Gallery | 7,500 |
| 69 | 5/23/97 | 1134 | SLMP check to Fortunoff | 11,408.54 |
| 70 | 5/23/97 | 1135 | SLMP check to Frank Portaro | 8,300 |
| 71 | 6/18/97 | 1147 | SLMP check to Luigi Portaro | 7,000 [19] |
| 72 | 7/2/97 | 1152 | SLMP check to Lina [20] Portaro | 3,500 |
| 73 | 7/2/97 | 1153 | SLMP check to Luigi Portaro | 3,500 |
| 74 | 7/2/97 | 1154 | SLMP check to Antonio Bruno | 3,000 |
| 75 | 7/2/97 | 1155 | SLMP check to Ciriaco Genova | 3,000 |
| 76 | 7/10/97 | 1157 | SLMP check to RE Steele | 13,250 |
| | 7/15/97 | 1158 | SLMP check to Phil Alfieri | 4,500 |
| | 10/6/97 | 1181 | SLMP check to Jupiter | 1,000 |
| | 11/7/97 | 1191 | SLMP check to IRS | 8,777 |
| | 11/19/98 | 261 | Peak Performance Corp. check to Astoria Fed. Sav. | 5,185.81 |
| | 1/10/99 | 1221 | SLMP check to Astoria Fed. Savings | 4,986.36 |
| | 3/11/99 | 268 [21] | United check to Astoria Fed. Savings | 4,986.36 |
| | 4/11/99 | ? [22] | United check to Astoria Fed. Savings | 4,986.36 |

**Total: $573,619.31**

Determining which checks evidence fraudulent transfers (and that the transfer of the original home was fraudulent) is only the first step in calculating the United

---

17. The United States mistakenly lists this as Check No. 1080 in its Amended Complaint. *Id.* ¶ 20.

18. SLMP's records date this check March 31, 1997. *Id.*

19. SLMP's records show $0 for this transaction for some reason. *Id.*

20. SLMP's records show this check going to Luigi Portaro, not Lina. *Id.*

21. The United States lists this as Check No. 266. Am. Compl. ¶ 28.

22. This appears to be the check that the United States lists as Check No. 283. *Id.*

States' entitlement. The economic reality of the transactions, the Court's equitable powers in overseeing a foreclosure sale, and various other factors make for a complex calculus.

### A. Mrs. Mazzeo's Baseline Obligation

 In principle, the United States is entitled to the equivalent of a money judgment in the amount of the contemporaneous fair market value of each transfer. *Gruenebaum*, 57 N.Y.S.2d at 147; *McGillicuddy*, 1995 WL 1081307, at *7 (collecting cases discussing remedies in fraudulent conveyance actions). To the extent that the transfers took the form of real property, fixtures, and personalty, the tax liens attach to them, subject to restrictions discussed below, because the United States has elected to "[d]isregard the conveyance and attach or levy execution upon the property conveyed." N.Y. Debt. & Cred. Law § 278(1)(b); *see also United States v. Bess*, 357 U.S. 51, 57, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) ("The transfer of property subsequent to the attachment of the lien does not affect the lien, for it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere." (citations and internal quotation marks omitted)). The Court holds that with regard to the transfers relating to home construction, the actual transfer was not of cash, but rather of fixtures, services, etc. Although the United States is theoretically only entitled to the contemporaneous value of the fixtures, services, etc., rather than the amount that Mazzeo paid for them (through corporate entities like SLMP), the only evidence that the Court has of contemporaneous fair market value is the amount that Mazzeo paid, so the Court will consider the amount that Mazzeo paid to be the fair market value of the fixtures, services, etc. A similar analysis applies to transfers of personalty.

The mortgage payments present a unique valuation problem. Here again, what was transferred was not the payment itself, but rather the reduction of the mortgage debt. An argument could be made that the only thing conveyed to Mrs. Mazzeo was the increase in equity resulting from the mortgage payments, an amount that would certainly be less than the amount of the payments themselves. The better argument is that the transfers were in fact worth the same amount as the mortgage payments. If Mazzeo had not made the mortgage payments, the Court can presume that Mrs. Mazzeo would have done so, in order to avoid foreclosure. The effect of Mazzeo's mortgage payments was thus indistinguishable from that of giving the money directly to Mrs. Mazzeo herself. Thus, the Court holds that the total amount of the transfers in Counts II and III was $573,619.31.

As for the original home, the Court must now determine what was actually conveyed. At the time of purchase, the home was valued at $335,000, but Mazzeo only paid $100,000 down, obligating himself on a $235,000 mortgage for the rest. The first mortgage payment of $2,877.34 was due August 1, 1995. The United States has presented no evidence as to whether Mazzeo made any of the four payments due before he conveyed the home to Mrs. Mazzeo in December 1985. Although people ordinarily make their mortgage payments, Mazzeo was "flat broke" at the time, and on numerous occasions in the years that followed he found himself unable to make timely payments (or sometimes any payments) on various note and mortgage obligations. The Court can scarcely presume that Mazzeo made some or all of the first four payments. Moreover, even if Mazzeo did make payments, there is no evidence as to how much, if at all, such payments increased his equity, given that the mortgage loan was not interest-free. *See* Pl.'s

Ex. 2 (copy of mortgage agreement). Given this state of affairs, and the absence of any evidence suggesting that the home's value changed in the first six months during which Mazzeo owned it, the Court holds that the value of what was transferred to Mrs. Mazzeo in December 1985 was $100,000.

The final consideration is the extent to which Mrs. Mazzeo can "set-off." She has paid substantial amounts of her own money over the years in relation to the home, particularly in the form of mortgage payments. These have almost certainly increased the value of the non-mortgaged equity in the property. In any case, she spent this money in the good-faith belief that the home belonged to her. She likely would not have spent so much, were it not for the United States' inequitable conduct in delaying its fraudulent conveyance action until thirteen years after she had taken possession. She is therefore entitled to some set-off against the United States' proceeds from sale of her home.

Generally, under New York law, set-off questions arise under New York Debtor and Creditor Law § 278(2), which allows a transferee who purchased fraudulently transferred property for less than fair consideration to retain the property as security for repayment of the consideration it did pay. Thus, such a purchaser is entitled to recoup his investment, and any remaining value in the property goes to the plaintiff.

It is difficult to see why a person who, though paying no consideration for fraudulently transferred property, in good faith invests her own money to improve the property, should not receive the same treatment. In such situations, a court encounters an innocent plaintiff and an innocent transferee, and must make some decision how to allocate losses. The New York legislature's likely reasons for placing the loss on the plaintiff in Section 278(2) apply equally to an innocent transferee who, though she paid no consideration, has subsequently invested in improving the property.[23] Protecting good faith purchasers, even those who pay less than fair consideration, reduces uncertainty in land investments, and thus promotes alienability of property. This protection also makes it more likely that a buyer will be willing to buy land from distressed sellers, thereby providing liquidity that might stave off

---

**23.** Without getting into a detailed discussion of jurisprudential questions surrounding statutory interpretation, the Court notes that it would reach the same conclusions about Section 278(2)'s policies whether it took a "legal process" approach ("What policies would a legislature composed of reasonable legislators acting reasonably have ascribed to this statute?") or a "strict textualist" approach ("What policies does the text of the statute, taken in context and understood within the textual structure of New York commercial law, suggest animate the statute?"), and that, although the statutory interpretation questions are sufficiently clear to obviate any need to examine legislative history, the Court expects that the policies it discusses are the ones the legislature actually intended. *See generally Hart & Sacks' The Legal Process: Basic Problems in the Making and Application of Law* (William N. Eskridge, Jr., Henry Melvin Hart & Philip P. Frickey, eds., 2001) (providing one of the most famous expositions of the legal process approach); Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997) (discussing Justice Scalia's brand of textualism); Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes,* 65 So. Cal. L.Rev. 845 (1992). Although the Court agrees, as all judges would, that statutory interpretation begins with a statute's text, "strict" textualists tend to overestimate the determinacy of language, and to underestimate the value of examining legislative history, of engaging in the kind of reasoning that the legal process school advocates, and of invoking concepts of justice and fairness, as they are embodied in our history and traditions and evidenced by existing statutes, opinions in decided cases, and other relevant legal materials.

serious financial disasters. Just as the Lockeans in the New York state legislature would want to encourage alienability of property, so they would want to encourage improvement thereof as well. Transferees of property would be reluctant to invest in improving their property if they faced a risk that some creditor of the transferor might swoop in and wipe out the value of such investments.

Although it seems clear that Mrs. Mazzeo is entitled to some protection for her investment, there remains the difficult question of how to value that entitlement. Of the many possible methods of valuation, two in particular stick out. The Court could set-off by the amount Mrs. Mazzeo actually invested, or by the amount that her investment increased the home's value. The former, like the method employed in Section 278(2), fully protects Mrs. Mazzeo's investment, to the United States' detriment. The latter prevents unjust enrichment on the United States' part, but does not necessarily fully protect Mrs. Mazzeo's investment.

There is one important difference between the situations of the purchaser for inadequate consideration and the gift recipient who later invests in improving the transferred property, and this difference might conceivably provide grounds for using a different approach than that embodied in Section 278(2). To the extent the plaintiff's right to recovery is based on the value of the property at the time of transfer, the actual value of what was transferred will be the property's contemporaneous fair market value, minus the (inadequate) consideration paid. Thus, while the second valuation method is sufficient to prevent unjust enrichment in cases like Mrs. Mazzeo's, the first is necessary to prevent unjust enrichment in the case of purchasers for inadequate consideration.

The Court need not determine whether the same valuation method would be appropriate in every case; it is enough to say that the first method, allowing Mrs. Mazzeo to set-off to the extent of her investment, is the best one in this case. In addition to the arguments in favor of limiting uncertainty for individuals investing in property, which would apply in every case, here the United States' inequitable conduct (discussed below), Mrs. Mazzeo's innocence, and the difficulty of determining to what extent her investment increased the home's value all point in the direction of the first method.

As for interest on the set-off, that too must ultimately be an equitable judgment. Had Mrs. Mazzeo not invested that money in paying down the mortgages, she could have paid off other debts, which would presumably carry similar rates of interest, or perhaps she could have invested it, if she was able sufficiently to separate her affairs from her husband's. In either case, New York's default statutory rate of interest of nine percent seems reasonable, and the Court will use it.

Because Mrs. Mazzeo has not provided the Court with evidence as to what she has invested in increasing the home's value, through mortgage payments, etc., the Court urges the parties to reach some kind of settlement as to the amount of set-off to which Mrs. Mazzeo is entitled. She is entitled to the value of each payment made, plus nine percent annual interest from the date of the payment. Should the parties be unable to reach agreement, the Court requests that the parties submit any relevant evidence. Just as the United States had to do, Mrs. Mazzeo must provide copies of checks, or similarly probative evidence, in order to prove particular payments.

## B. Interest

■ The United States is not necessarily entitled to prejudgment interest of nine percent per year, notwithstanding the facts that New York has established a statutory rate of interest of nine percent, N.Y. C.P.L.R. § 5004, and routinely awards certain plaintiffs prejudgment interest, *see id.* § 5001(b) ("Interest shall be computed from the earliest ascertainable date the cause of action existed . . . ."); *Prager v. New Jersey Fid. & Plate Glass Ins. Co.*, 245 N.Y. 1, 6, 156 N.E. 76 (1927) (Cardozo, C.J.) (holding that, in many cases where a plaintiff has been denied use of money to which he is entitled, "[i]nterest must be added if we are to make the plaintiff whole"). New York law provides for award of interest in breach of contract cases and in cases involving "an act or omission depriving or otherwise interfering with title to, or possession and enjoyment of, property." *Id.* § 5001(a). Admittedly, courts have interpreted Section 5001(a) to apply broadly. *Mallis v. Bankers Trust Co.* 717 F.2d 683, 695 (2d Cir. 1983) (collecting cases to support the proposition that "[c]ourts applying § 5001(a) have without qualification awarded interest as a matter of right whenever any tortious conduct causes pecuniary damage to tangible or intangible property interests"). Cases awarding interest in fraudulent conveyance actions, however, are difficult to find. *Shamis v. Ambassador Factors Corp.*, 2001 WL 25720, at *6 (S.D.N.Y. Jan.10, 2001) (awarding pretrial, prejudgment interest on a fraudulent conveyance claim, but noting that the court could only find one other case (*In re Cardon Realty Corp.*, 146 B.R. 72, 81 (Bankr.W.D.N.Y. 1992)) that had done so). It is worth noting that *Shamis* is a federal case interpreting New York law, and that *Cardon Realty*, a federal bankruptcy case, might not have involved interpretation of New York law at all, but rather an exercise of the bankruptcy court's discretion (under *federal* bankruptcy law) to award interest, and using the New York statutory rate as a convenient rule of decision. *See In re All American Petroleum Corp.*, 259 B.R. 6, 20–21 (Bankr.E.D.N.Y.2001) (interpreting *Cardon Realty* in this way). Moreover, *Cardon Realty* awarded interest with virtually no discussion, weakening its force as a guide for decision in this case.

The Court assumes, however, that *Shamis* was correctly decided, and that *Cardon Realty* was correct to the extent it was interpreting New York state law, because the absence of intentional conduct on Mrs. Mazzeo's part makes those cases distinguishable. In both *Shamis* and *Cardon Realty*, the fraudulent conveyance defendants could be charged with intentional conduct. *Shamis* involved defendants who had participated in an actually fraudulent scheme. *See Shamis*, 2001 WL 25720, at *2 (noting that the court had previously held that each fraudulent conveyance defendant should share equally in liability for a large punitive damages award based on their conduct). *Cardon Realty* involved constructively fraudulent transfers from a corporation to a woman who was its president and sole shareholder, and to her husband. *See Cardon Realty*, 146 B.R. at 75, 77–78. If anyone can be charged with knowing the financial status of a transferor corporation, it is the transferor corporation's owner and president. This focus on intentional conduct is entirely consistent with the examples that *Shamis* and *Mallis* cite of awards of prejudgment interest in non-contract cases involving interference with property rights.

This Court has already held that the United States failed to prove any fraud on the part of Mrs. Mazzeo. The earliest date on which the Court can charge her with any kind of intentional conduct is December 21, 1995, the date Mazzeo filed for Chapter 13 relief. From that point,

Mrs. Mazzeo was on notice that her husband was potentially insolvent, that any subsequent transfers to her might be at least constructively fraudulent, and that the same might apply to transfers in the two or three years leading up to that date. At that point, however, Mrs. Mazzeo had no reason to believe that the transfer of the home had been fraudulent; as this Court has held, Mazzeo was solvent in December 1985. The first date on which Mrs. Mazzeo can be charged with knowledge that the transfer of the home was potentially fraudulent is April 22, 1998, the date the United States filed this case.

Fixing these "dates of responsibility" does not end the inquiry, however. New York Civil Practice Law and Rules § 5001(a) has an important exception for "an action of an equitable nature." *Id.* In such cases, "interest and the rate and date from which it shall be computed shall be in the court's discretion." *Id.* The United States is seeking equitable relief under New York Debtor and Creditor Law § 278(1)(b). This Court therefore has discretion to determine appropriate interest.

A balancing of the equities does not work out particularly favorably for the United States, at least as regards the transfer of the home. The United States has been actively seeking to recover on Mazzeo's debts to it since at least 1987, and it would have been easy enough for the United States to determine that the transfer of the home had likely been fraudulent, and to bring a fraudulent conveyance action some time in the 1980s, at least. Instead, it waited an entire decade before bringing such an action. The United States' delay created an unnecessarily harsh disruption of Mrs. Mazzeo's and her son's settled expectations, and if the United States had acted sooner, there is a distinct possibility that Mazzeo's 1984 tax debt could have been satisfied, saving Mrs. Mazzeo from effective liability for years of interest and penalties.

Moreover, the United States' delay in bringing this action might well have permitted it to circumvent the bankruptcy process. Had the transfer of the home been set aside before Mazzeo filed for bankruptcy, the home might have become property of the bankruptcy estate, subject only to relevant mortgage debt and to the 1987 lien. Sale of the home might have satisfied all of those debts, with some proceeds left over for distribution to Mazzeo's other creditors. This is because under 11 U.S.C. § 362(b)(9)(D), the 1996 assessment could not have attached a lien to property of the bankruptcy estate. As things stand, those proceeds will instead go to satisfy Mazzeo's 1996 assessment, without satisfying any other Mazzeo creditors' debts.

Lastly, having unduly delayed its fraudulent conveyance action, the United States could only maintain it by manipulating its application of Mazzeo's tax payments in a manner that, though legally permitted, can hardly be characterized as fair.

Mrs. Mazzeo, by contrast, is largely innocent in these matters, and particularly in the transfer of the home, for the reasons discussed above. Although she is not entitled to any windfall from the conveyances, neither should she be punished for her failure to discover that they were fraudulent. There is no evidence that her possession of the home produced any pecuniary benefit to her, beyond what she would have enjoyed had Mazzeo retained title. She certainly did not enjoy anything like a nine percent annual return on the value of the home. The United States is already set to capture much or all of any appreciation in value that the home experienced in the years she possessed it (subject to set-off for her investments in the home, plus interest), so the only question is whether possession of the home permitted her to

invest money elsewhere, or increased her access to credit for investment capital. There is no evidence that either occurred, because the basic facts of Mrs. Mazzeo's existence would have been largely the same regardless of where title in the house resided. As suggested above, if anything, her husband's transfer of the home and the United States' failure to reverse that transaction made her financial situation worse, not better.

The United States thus is entitled to no interest on the 1985 home transfer until April 22, 1998, the date it filed this action. After that date, the Court awards the United States interest at the rate of nine percent, again adopting the statutory rate as a reasonable guide for equitable judgment.

■■■ As the Court has already suggested with regard to the transfers in Counts II and III, they are close enough in time to Mazzeo's filing for Chapter 13 relief that it is appropriate to award the United States interest. Because those Counts involve a series of transfers over time, the Court has discretion to compute interest as if all of the transfers had taken place on "a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b); see Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 91 (2d Cir.1998) (citing 155 Henry Owners Corp. v. Lovlyn Realty Co., 231 A.D.2d 559, 647 N.Y.S.2d 30, 32 (2d Dep't 1996)). The earliest of the transfers in question occurred on July 5, 1994, and the last of them occurred on April 11, 1999, roughly four years and nine months later. Interest will thus be calculated as if all of the transfers, totaling $573,619.31, occurred on November 23, 1996, the midpoint between those two dates. The annual interest rate will be nine percent.

Although the matter is academic at this point, to the extent the Court's interest award is lower than it would have been in the presence of intentional conduct, there is no reason why the United States cannot pursue Mazzeo's estate for the difference, as Mazzeo's conduct was constructively fraudulent with regard to all the transfers and actually fraudulent with regard to most or all of them.

## C. Relation of the Transfers to the Bankruptcy Estate

■■■ As the United States correctly pointed out, this Court erred in its initial conclusion that fraudulently transferred property would go into the bankruptcy estate, to be distributed amongst Mazzeo's creditors in accordance with the bankruptcy laws. The Court was wrong first of all for not recognizing that transfers involving funds Mazzeo earned after filing his Chapter 11 petition would not go into the estate, as those funds were not property of the estate. See 11 U.S.C. § 541(a)(1). More fundamentally, the Court was mistaken insofar as none of the transfers should go into the bankruptcy estate, because none of them constitutes property of the estate. Although a bankruptcy trustee has certain powers to avoid fraudulent conveyances, see id. §§ 544(b) & 548, neither property fraudulently conveyed by the debtor before filing nor a potential fraudulent conveyance action that the Trustee could bring against one of the debtor's transferees is property of the estate, see id. § 541; In re Colonial Realty Co., 980 F.2d 125, 131 (2d Cir.1992). Although the automatic stay temporarily prevents individual creditors from pursuing fraudulent conveyance actions on their own, 11 U.S.C. § 362(a), once the debtor receives a discharge or the case is otherwise dismissed or closed, creditors are free to pursue such remedies as are available to them, except insofar as they cannot proceed against property of the estate. Thus, under 11 U.S.C. § 524(a), the discharge is limited only to the debtor's personal liabilities, and under 11 U.S.C. § 524(e), creditors can proceed

against property in the hands of third parties. In practice, it may be rare that a creditor other than the United States can do this, because most creditors do not share the United States' privilege of immunity from state law statutes of limitations. *See United States v. Podell,* 572 F.2d 31, 35 n. 7 (2d Cir.1978). Only Congress can revoke this privilege, and it has not done so here. *See id.*

In this case, the Trustee has abandoned any claim to avoid the fraudulent conveyances that are the subject of this action, and the relevant statutes of limitations— for pre-petition transfers, one year from the trustee's appointment or, if earlier, two years from the filing of the petition—have run. *See id.* § 546(a).[24] Thus, any recovery in this case falls to the United States alone.

### D. Nature and Amount of the United States' Recovery and Application of Proceeds from Foreclosure

■ According to the general rule, the tax liens attach to all of the real and personal property described above, regardless of how much it has appreciated in value, until the liens are satisfied or somehow become unenforceable. *See* 26 U.S.C. § 6322; *United States v. Librizzi,* 108 F.3d 136, 138–39 (7th Cir.1997); *United States v. Avila,* 88 F.3d 229, 233 (3d Cir. 1996); *United States v. Blakeman,* 997 F.2d 1084, 1092–93 (5th Cir.1992), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 654 (1994); *Han v. United States,* 944 F.2d 526, 528–29 (9th Cir.1991); *United States v. Morrell,* 137 F.Supp.2d 130, 138–39 (E.D.N.Y.2001). This is merely a statement about the means the United States may use to recover what Mrs. Maz-

zeo owes it as a result of the fraudulent conveyances, however. It says little about the extent of the United States' entitlement to recovery; that is determined by the amount of the fraudulent conveyance debt. Moreover, Mrs. Mazzeo is entitled to a portion of the proceeds from any foreclosure sale equal to her investment in the home, plus interest, as described above.

As a practical matter, in the likely event that the foreclosure sale proceeds and the proceeds thereof, minus Mrs. Mazzeo's share, are insufficient to satisfy either the tax liens or the fraudulent conveyance debt, whichever is smaller, Mrs. Mazzeo will be required to pay her share directly back to the United States. In other words, Mrs. Mazzeo would still have a debt to the United States, based on the judgment in this fraudulent conveyance action. The United States, however, could only collect via the mechanisms available for collecting ordinary judgment debt in order to satisfy any remaining debt based on the fraudulent conveyances. It could not rely on the tax liens.

Thus, the United States is entitled either to the amount of its fraudulent conveyance judgment, or the amount of relevant debt that Mazzeo owes the United States, whichever is smaller.[25] The United States is entitled to foreclose on the relevant real property and personalty, to the extent of its liens (subject to limitations discussed below), and subject to Mrs. Mazzeo's offset for her investment in the real property. The United States is then entitled to pursue ordinary judgment creditor remedies for the remainder of the fraudulent conveyance judgment. It may well be

---

**24.** If any of the post-petition transfers involved property of the estate, the trustee could avoid them under 11 U.S.C. § 549, but the statute of limitations—two years after the

transfer, and before the case closes—has run. *Id.*

**25.** It would surprise the Court if Mazzeo's debt were the smaller number.

appropriate for the United States to retain Mrs. Mazzeo's set-off in the foreclosure sale in satisfaction of Mrs. Mazzeo's remaining debt to it, but the Court has no occasion to make a ruling one way or the other at this time, particularly given the possibility that the United States might drive Mrs. Mazzeo into bankruptcy, a development that would obviously complicate matters.

Having determined the general framework, the Court must now resolve some more specific issues. The first is to what property each of the liens applies. The United States has urged the Court to apply both liens to all the property, as another method would prove complicated. *See* Pl.'s Mem. at 22–31. Unfortunately, complexity is often inevitable when creditors engage in unorthodox collection and accounting methods, as the United States has done here.

As a legal matter, because Mrs. Mazzeo did not engage in any active or constructive fraud, the United States cannot rely on its Responsible Person tax debt (evidenced by the 1996 lien) to reach the original, December 1985 transfer of the home. Because all of the transfers in Counts II and III were part of a single constructively fraudulent course of conduct, however, the United States can reach those transfers under either tax debt.

As the United States has suggested, this approach adds complexity. Some portion of the proceeds from a foreclosure sale of the home will be chargeable to the Count II and III transfers, and some portion to the original transfer of the home (insofar as that transfer included the *land* on which the new house has been built). The Court, which has discretion to determine how proceeds from a judicial foreclosure shall be applied, *see Orleans County Nat'l Bank v. Moore,* 112 N.Y. 543, 547–48, 20 N.E. 357 (1889), shall apply the proceeds chargeable to the original 1985 transfer to the 1984

tax debt. Once the United States has satisfied its 1984 tax debt, however, the law entitles Mrs. Mazzeo to the amount, if any, by which the portion chargeable to the initial transfer exceeds the amount of the 1984 tax debt. As suggested above, in such a scenario the United States might well be able to take those proceeds right back from Mrs. Mazzeo, as an ordinary judgment creditor, but the Court has no occasion to speculate on what will happen, particularly given the possibility that Mrs. Mazzeo might end up in bankruptcy.

Having described the proper calculus, the Court does not at this time make any determination as to the amount of proceeds that would be attributable to the land on which the homes were built, as there is insufficient evidence in the record to do so, and no useful purpose is served in consuming the parties' resources in resolving the question. As suggested, the most likely result is that the United States will be able to set-off against any proceeds to which Mrs. Mazzeo is entitled, so there will be no practical need to calculate by what amount, if any, the portion of the proceeds attributable to the land value, exceeds the United States' 1984 tax debt, unless, for example, Mrs. Mazzeo ends up in bankruptcy. Should that happen, the parties may well find themselves required to engage in just such a calculation, with all of the wasted resources that entails (because, for that amount, the United States will likely be treated as an ordinary judgment creditor, and may thus be limited in its recovery by the rights of other creditors). Again, the Court need not speculate on such matters.

Next, the Court notes that Mazzeo's bankruptcy discharge does not appear to affect matters, because all of his federal tax debts are excepted from discharge. *See* 11 U.S.C. §§ 523(a)(1) & (7), 727(b).

Further, there is the matter of how much Mazzeo's estate owes to the United States, as his debt constitutes a limitation on how much the United States can recover. The United States can recover the amount of the transfers, plus interest, or the amount of Mazzeo's tax debts, whichever is smaller, subject to limitations discussed above. As the Court has already noted, the United States has admitted that as of June 30, 2002, no more than $134,551.57 still owed on the 1984 liability in accrued interest. There has been little discussion of the amount of Mazzeo's debt on the 1994 tax liability; indeed, the United States was originally pursuing a determination on that question in another case, which case was dismissed. The United States has admitted that the proper assessment for that debt, as of November 27, 1996, is no higher than $740,098.30. *See* Pl.'s Ex. 31(a); Pl.'s Prop. Findings of Fact ¶ 4.

As is clear from Mrs. Mazzeo's attempt to introduce testimony by Accountant Harvey Mendelsohn, the amount of Mazzeo's tax liabilities was clearly in issue in this case, so the parties are entitled to some statement by the Court in that regard. Mrs. Mazzeo has presented no evidence suggesting the incorrectness of the United States' assessments (she never took the Court up on its offer to accept evidence from Mr. Mendelsohn post-trial), and there is a general presumption that federal tax assessments are correct, *see United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (citing *Bull v. United States*, 295 U.S. 247, 259–60, 55 S.Ct. 695, 79 L.Ed. 1421 (1935)). Therefore, the Court holds that, at least for purposes of determining what the United States can recover in this fraudulent conveyance action, the United States' November 9, 1987 assessment of $102,161.99 (Pl.'s Ex. 31), and its revision of the November 27, 1997 assessment to $740,098.30 (Pl.'s Ex. 31(a)), are correct.

Thus, the Court orders the United States promptly to calculate the present amounts owed, based on those assessments, and promptly to provide Mrs. Mazzeo and the Court both with those calculations and with the means to determine how much more accrues with each passing day until the day of the foreclosure sale. Mrs. Mazzeo may only challenge the United States' calculations; she may not challenge the original assessments on which they are based. Similarly, should Mrs. Mazzeo seek to set-off her investments in the home (through mortgage payments, etc.), she must promptly provide the United States and the Court with a list of any investments she made, with competent evidence thereof, and a calculation of the present value of those investments (calculating interest as described above). The Court strongly urges the parties to reach an agreement on the amount Mrs. Mazzeo is entitled to set-off. Otherwise, the Court shall make a ruling, holding a hearing if necessary.

Lastly, there is the question of the significance of the stipulation between the United States and the State of New York, regarding the division of any recovery in this case. *See* Pl.'s Ex. 79. New York has abandoned any claim it might have against Mrs. Mazzeo regarding the fraudulent conveyances alleged in this action, except to the extent that it may share in the United States' recovery, if any. New York has not proved anything on the record with regard to the extent of debts Mazzeo owed to it or to the question whether any of the transfers were fraudulent with regard to such debts, and to what degree. Moreover, the United States obviously benefitted from not having to contend with New York over priority, and New York obviously benefitted from not having to expend any resources to recover on the alleged fraudulent conveyances.

Thus, any recovery against Mrs. Mazzeo shall be regarded as going solely to the United States, regardless of what payments the United States makes to New York pursuant to the stipulation. For example, if the United States' entire debt were $100,000, the United States had agreed to give twenty percent of any recovery to New York, and the foreclosure sale left $125,000 in proceeds after satisfying all debts with priority over the United States, the United States could not collect the full $125,000, retaining $100,000 for itself and giving $25,000 to New York. Rather, it could only collect $100,000, leaving the remaining $25,000 for Mrs. Mazzeo, even though the stipulation required the United States to give New York $20,000.[26]

## V. CONCLUSION

For the foregoing reasons, the Court holds the following. Both the United States and Mrs. Mazzeo shall promptly provide to one another and to the Court the information described above (amount and method of calculation of Mazzeo's tax liability, and nature, amount, and evidence of Mrs. Mazzeo's investment in the property, respectively). The United States is entitled to foreclose against the real property located at 41 Post Avenue, East Williston, New York, including any improvements built thereon (in particular, the home) and any fixtures. Proceeds therefrom shall go: first to satisfy the valid first mortgage debt of Astoria Savings and Loan, or its successor in interest; then to satisfy Mrs. Mazzeo's set-off for her in-

vestments in the home, if any, plus interest, as described above; then to satisfy the United States' 1984 tax debt; and then to satisfy the United States' 1994 tax debt.[27] The United States is further entitled to foreclose against any of Mrs. Mazzeo's personalty that was purchased directly through one of the transfers detailed above. The proceeds from such sale shall be applied first to the United States' 1994 debt, and second, in the unlikely event that the 1984 debt is not satisfied by sale of the real property, to the 1984 debt.

Subject to restrictions discussed below, the United States is entitled to recover the lesser of the value of the fraudulent conveyances, plus interest, or the value of its debts. The value of the fraudulent conveyances is as follows: The 1985 transfer of the home (and the land on which it was built) was worth $100,000, augmented by nine percent annual interest, compounded from the date of April 22, 1998. The transfers detailed from Counts II and III are worth $573,619.31, augmented by nine percent interest, compounded from the date of November 23, 1996. The United States' tax debts shall be calculated based on its November 9, 1987 assessment of $102,161.99 and on its revision of the November 27, 1997 assessment to $740,098.30.

If, after satisfying Astoria Savings and Loan's mortgage debt, any set-off for Mrs. Mazzeo's investments in the property, and any other debt with priority, the foreclosure sale of the home and personalty (if any) produces proceeds in an amount equal to or less than the sum of the Count II and

---

**26.** The Court obviously has no occasion to reach the question whether the same calculus would apply in determining the extent of Mazzeo's estate's remaining federal tax liability after this action is resolved, and that question is likely academic in any case.

**27.** Obviously, if there is some other creditor of whom the Court is unaware that is entitled

to fit somewhere within this priority scheme, this Court's judgment must not be understood to infringe upon their rights. Thus, for example, if there are outstanding state or local property taxes due for the property, and relevant law entitles a state or local entity to some kind of lien on the property, then that lien must be honored to the extent required by law.

III fraudulent transfers ($573,619.31, plus interest) plus the remaining debt on the 1984 tax liability, the United States shall be entitled to retain all such proceeds, and to collect from Mrs. Mazzeo an amount sufficient to reach the lesser of the combined value of all the fraudulent transfers or the combined value of the tax debts, whichever is smaller. This works, of course, only in the absence of some circumstance, such as Mrs. Mazzeo filing for bankruptcy, that would necessitate a closer examination of the portion of the proceeds attributable purely to the land conveyed in December 1985.

To the extent that the remaining proceeds exceed the sum of the Count II and III fraudulent transfers ($573,619.31, plus interest) plus the remaining debt on the 1984 tax liability, Mrs. Mazzeo shall be entitled to such excess proceeds.

SO ORDERED.